Marilyn W. PEARSON, as Administratrix of the Goods, Chattels, and Credits of John S. Pearson, deceased, Plaintiff-Appellee,

v.

NORTHEAST AIRLINES, INC., Defendant-Appellant.

No. 297, Docket 27350.

United States Court of Appeals Second Circuit.

Argued April 11, 1962.

Decided July 11, 1962.

Rehearing Granted Sept. 13, 1962.

Haight, Gardner, Poor & Havens, New York City, for appellant. William J. Junkerman and Douglas B. Bowring, New York City, of counsel.

Frank G. Sterritte and Speiser, Shumate, Geoghan & Law, New York City (Stuart M. Speiser and Florindo M. De-Rosa, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and SWAN and KAUFMAN, Circuit Judges.

SWAN, Circuit Judge.

This appeal involves litigation which resulted from the crash, on August 15, 1958, of appellant's airplane on Nantucket Island. Mrs. Pearson as administratrix of her deceased husband's estate brought suit in the Southern District of New York, federal jurisdiction resting on diversity of citizenship, she being a citizen of New York and defendant a Massachusetts corporation. Her complaint alleged seven causes of action,[1] but there remains for consideration on the appeal only the cause of action based on the Massachusetts wrongful death act, which limits recovery to $15,000, and certain orders of the trial court denying defendant's motions (a) to dismiss the complaint insofar as it sought damages for wrongful death in excess of $15,000, (b) for a directed verdict for plaintiff in the amount of $15,000, (c) for judgment *non obstante veredicto* in the limited amount of $15,000, and (d) for an order striking out that portion of the judgment which awarded plaintiff interest from the date of death, August 15, 1958, to the date of judgment, November 16, 1961, amounting to $26,106.88.

In denying defendant's motions to limit recovery to the maximum permitted under the Massachusetts wrongful death act,[2] Judge McGohey ruled that he was obliged to apply a dictum of the New York Court of Appeals in Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 to the effect that the Massachusetts limitation would not be enforced against a New York citizen suing in a New York court.[3] He also ruled that the damages should be measured not by "the degree of culpability of defendant," as required by the Massachusetts statute, but "by New York's standard of the pecuniary damage resulting to the beneficiaries from the death." Judge McGohey's opinion is reported at 199 F.Supp. 539. Later, in

---

1. Four of the original causes of action were dismissed by Judge Weinfeld in a memorandum decision published at D.C., 180 F.Supp. 97. Another based on decedent's pain and suffering prior to death, was dismissed at the close of the trial for lack of proof. The seventh count was for loss of personal property of the decedent. As to this, the court, on defendant's motion, directed a verdict for $100, and plaintiff has not appealed.

   Mrs. Pearson also filed a libel in admiralty which was dismissed for lack of jurisdiction at D.C., 199 F.Supp. 538.

2. Chapter 229, section 2, Massachusetts General Laws:

   "§ 2. Damages for death by negligence of common carrier. If the proprietor of a common carrier of passengers * * * causes the death of a passenger, he or it shall be liable in damages in the sum of not less than two thousand nor more than fifteen thousand dollars, to be assessed with reference to the degree of culpability of the defendant or of his or its servants or agents, and recovered and distributed as provided in section one, and to the use of the persons and in the proportions, therein specified."

3. Jack Kilberg sued as administrator of the estate of Edward J. Kilberg, a passenger on the plane who was killed in the same crash as Mrs. Pearson's husband. The opinion states:

   " * * * For our courts to be limited by this damage ceiling (at least as to our own domiciliaries) is so completely contrary to our public policy that we should refuse to apply that part of the Massachusetts law. * * *

   *       *       *       *       *

   "We will still require plaintiff to sue on the Massachusetts statute but we refuse on public policy grounds to enforce one of its provisions as to damages.

   *       *       *       *       *

   "As to whether the measure of damages should be treated as a procedural or a substantive matter in wrongful death cases, there is authority both ways * *. It is open to us, therefore, particularly in view of our own strong public policy as to death action damages, to treat the measure of damages in this case as being a procedural or remedial question controlled by our own State policies.

   *       *       *       *       *

   "From all of this it follows that while plaintiff's second or contract cause of action is demurrable, his first count declaring under the Massachusetts wrongful death action is not only sustainable but can be enforced, if the proof so justifies, without regard to the $15,000 limit."

   Northeast's brief in this court states that Mrs. Kilberg did not amend her complaint but accepted less than $15,000 in settlement, and discontinued her action.

denying defendant's motion to strike pre-judgment interest, he wrote a memorandum decision and order reported at D.C., 201 F.Supp. 45.

From these rulings of the trial court the defendant has appealed. It is not contended that in refusing to enforce the Massachusetts limitation of $15,000 Judge McGohey misconstrued the Kilberg dictum. It is contended that such ruling violates the full faith and credit clause and the due process clause of the United States Constitution. With respect to the rulings on the measure of damages and on pre-judgment interest appellant contends that the trial court did misconstrue the New York law, or, if he correctly construed it, that the New York law is similarly unconstitutional. For reversal of the ruling as to pre-judgment interest reliance is also placed on a decision of the Appellate Division, First Department, made subsequent to Judge McGohey's decision of December 15, 1961.[3a]

Appellant devotes some ten pages of its brief to criticism of the Kilberg dictum in the endeavor to show that it "represents not only an ill-advised excursion into the field of advisory opinions, but a misconception (at least) of the earlier New York law and bad law in itself," and notes that three judges of the Court of Appeals stated in vigorous terms that the majority had no "warrant or justification" for going beyond the issue decided. We think it inappropriate for this court to discuss the wisdom or the soundness of the majority's dictum, and there is no necessity of our doing so. Consequently we pass at once to a discussion of the appeal.

■ Since federal jurisdiction rests on diversity, it is clear that Judge McGohey was obliged to apply the law of the State of New York, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, including its conflict of laws doctrine, Klaxton Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, unless some provision of the Constitution of the United States precludes its application. On the main issue, limitation of liability, appellant contends that application of the dictum violates the full faith and credit clause, while appellee contends that this provision does not preclude a State from applying its own conflict of laws rule.

A majority of the court holds, Judge Kaufman dissenting, that the trial court's refusal to apply the $15,000 limitation of the Massachusetts statute violates the Full Faith and Credit Clause of the Constitution. (Art. IV, section 1.)[4] In denying the motion to strike out pre-judgment interest, we are all agreed that the trial court erred.

■ The purpose of the full faith and credit clause of the Constitution, as briefly explained in Sherrer v. Sherrer, 334 U.S. 343, 355, 68 S.Ct. 1087, 1097, 92 L. Ed. 1429, was to transform an aggregate of independent sovereign states into a nation. "If in its application local policy must at times be required to give way, 'such is part of the price of our federal system.' * * *" [citation omitted]. To like effect is Estin v. Estin, 334 U.S. 541, 545–546, 68 S.Ct. 1213, 92 L.Ed. 1561. Neither of these cases was an action for wrongful death. The conflict between a foreign wrongful death action and a statute of the forum has been considered by the Supreme Court in three cases: Hughes v. Fetter, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212; First National Bank of Chicago v. United Air Lines, 342 U.S. 396, 72 S.Ct. 421, 96 L. Ed. 441; Wells v. Simonds Abrasive Co., 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211.

3a. Davenport v. Webb, 15 A.D.2d 42, 222 N.Y.S.2d 566. This decision was affirmed on June 12, 1962, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 183 N.E.2d 902.

4. "Section 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." (See also the implementing statute, 28 U.S.C.A. § 1738.)

Appellant relies upon the first two; appellee upon the last.

In Hughes the highest court of Wisconsin affirmed the dismissal of an action brought under the wrongful death statute of Illinois on the ground that a Wisconsin statute had been construed by its courts as establishing a local public policy against entertaining suits brought under wrongful death statutes of other States. This was reversed by the Supreme Court as a violation of the full faith and credit clause, Mr. Justice Black, who wrote the majority opinion, stating at pages 611–612 of 341 U.S., at page 982 of 71 S.Ct.:

" * * * We have recognized, however, that full faith and credit does not automatically compel a forum state to subordinate its own statutory policy to a conflicting public act of another state; rather, it is for this Court to choose in each case between the competing public policies involved. The clash of interests in cases of this type has usually been described as a conflict between the public policies of two or more states. The more basic conflict involved in the present appeal, however, is as follows: On the one hand is the strong unifying principle embodied in the Full Faith and Credit Clause looking toward maximum enforcement in each state of the obligations created or recognized by the statutes of sister states; on the other hand is the policy of Wisconsin, as interpreted by its highest court, against permitting Wisconsin courts to entertain this wrongful death action.

"We hold that Wisconsin's policy must give way. That state has no real feeling of antagonism against wrongful death suits in general. * * * "

■ As in Hughes, the present appeal involves the same "more basic conflict" —a conflict between "the strong unifying principle embodied in the Full Faith and

Credit Clause" and the public policy of New York expressed in the Kilberg dictum. It is likewise true that New York has no antagonism to wrongful death actions in general. Its antagonism is only to the limitation of liability. Its own statute has no limitation but the opinion recognizes that plaintiff's rights arise under the Massachusetts statute, not the New York statute.[5] The Supreme Court is the final authority to choose "between the competing public policies involved." But on the present appeal this court must make the choice. This court believes that the "strong, unifying principle" of the full faith and credit clause should prevail.

In the First National Bank case the suit was brought in a federal district court in Illinois, on grounds of diversity of citizenship, to recover under the Utah wrongful death statute for a death which occurred in Utah. As required by an Illinois statute, the trial court dismissed the suit, and the Court of Appeals affirmed, 7 Cir., 190 F.2d 493. But the Supreme Court held the statute invalid under the full faith and credit clause of the Constitution. In a concurring opinion Mr. Justice Jackson wrote at page 400 of 342 U.S., at page 423 of 72 S.Ct.:

"For the essence of the Full Faith and Credit Clause is that certain transactions, wherever in the United States they may be litigated, shall have the same legal consequences as they would have in the place where they occurred. [Citations omitted.]

"There is undoubtedly some area of freedom for state conflicts law outside the requirements of the Full Faith and Credit Clause. In such matters, unreached by constitutional law, the state rule would prevail in a diversity court. Klaxon Co. v. Stentor [Electric Mfg.] Co., 313 U.S. 487 [61 S.Ct. 1020, 85 L.Ed. 1477]. But if a transaction is so associated with one jurisdiction that

---

5. See note 3, supra; also the Court of Appeals discussion of Kilberg in Davenport

v. Webb, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 183 N.E.2d 902.

the Constitution compels any forum in which the transaction is litigated to apply the law of that jurisdiction, is it not the Constitution instead of state conflicts law which determines what law the federal court shall apply?"

That the answer to this question should be "yes" is the belief of a majority of this court.

In Wells v. Simonds Abrasive Co., 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211, plaintiff's decedent was killed in Alabama by a bursting emery wheel alleged to have been defective. The Alabama wrongful death act contained a "built in" two-year statute of limitations. Within two years, but more than one year, after decedent's death, plaintiff sued the manufacturer of the emery wheel in a federal court in Pennsylvania, jurisdiction resting on diverse citizenship. The Pennsylvania statute of limitations was one year, and the issue was whether the court was compelled to give full faith and credit to the two-year limitation of Alabama. The Supreme Court held it was not. Mr. Chief Justice Vinson's opinion distinguished Hughes and First National Bank on the ground that in those cases "the forum laid an uneven hand on causes of action arising within and without the forum state" whereas "Here Pennsylvania applies her one-year limitation to all wrongful death actions wherever they may arise." The opinion explains that the court "long ago" had held that applying the statute of limitations of the forum to a foreign substantive right did not deny full faith and credit, and states that that clause "does not compel a state to adopt any particular set of rules of conflict of laws; it merely sets certain minimum requirements which each state must observe when asked to apply the law of a sister state." [6]

The appellant argues that the "minimum requirements" which New York must observe demand enforcement of the Massachusetts limitation, because, as

stated by Mr. Justice Holmes in Slater v. Mexican National R. Co., 194 U.S. 120, 126, 24 S.Ct. 581, 48 L.Ed. 900: "It seems to us unjust to allow a plaintiff to come here absolutely depending on the foreign law for the foundation of his case, and yet to deny to the defendant the benefit of whatever limitations on his liability that law would impose." In Davis v. Mills, 194 U.S. 451, at 454, 24 S.Ct. 692, at 693, the same Justice said: " * * * But, as the source of the obligation is the foreign law, the defendant, generally speaking, is entitled to the benefit of whatever conditions and limitations the foreign law creates."

Appellant argues further that there is an obvious distinction between the Wells case and the case at bar. In Wells the plaintiff was not deprived of all remedy; he could sue in any state where defendant could be found and which has a longer statute of limitations than Pennsylvania or follows a different conflicts rule. In our case defendant had no choice as to the forum. If deprived of the protection of the limitation imposed by the law which, as Kilberg recognizes, created the liability, he will be treated unjustly.

A defendant is in a different position from a plaintiff who seeks to enforce a cause of action conferred by the laws of another state, as Mr. Justice Brandeis pointed out in Bradford Electric Light Co. v. Clapper, 286 U.S. 145, 160, 52 S.Ct. 571, 76 L.Ed. 1026:

> " * * * A State may, on occasion, decline to enforce a foreign cause of action. In so doing, it merely denies a remedy, leaving unimpaired the plaintiff's substantive right, so that he is free to enforce it elsewhere. But to refuse to give effect to a substantive defense under the applicable law of another State, as under the circumstances here presented, subjects the defendant to irremediable liability. This may not be done." [Citations omitted.]

6. Cf. dissenting opinion of Mr. Justice Jackson in which Mr. Justice Black and

Mr. Justice Minton joined. 345 U.S. 519, 73 S.Ct. 856, 97 L.Ed. 1211.

The Clapper case involved the workmen's compensation laws of Vermont and New Hampshire. Appellant concedes that the decision has been diluted by subsequent cases dealing with workmen's compensation but argues persuasively that nothing in the later cases gives support to the proposition that full faith and credit must give way to a local policy not embodied in a statute which directly governs the cause of action.[7] As previously noted, Kilberg "still requires plaintiff to sue on the Massachusetts statute"; it does not claim extra-territorial effect for the New York wrongful death act. In our opinion the workmen's compensation decisions are distinguishable from the case at bar.

So also are decisions involving the federal Tort Claims Act. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed. 2d 492, cited by appellee as favorable to it, is favorable to appellant, if it has any relevance. No constitutional question was there presented; Missouri was the place of the death, and Oklahoma the place of the negligence. Missouri, like Massachusetts, had a $15,000 limitation on wrongful death damages, and Oklahoma, like New York, had a constitutional limitation against such limitation. The final result of the litigation was to apply the Missouri statute, where the death occurred. See Richards v. United States, 10 Cir., 285 F.2d 521, which the Supreme Court affirmed.

There is no decision by the Supreme Court that the failure to enforce the limitation of a foreign wrongful death act is consistent with the full faith and credit clause of the Constitution. A majority of this court holds it is not. Consequently it is unnecessary to consider appellant's other contentions, except the ruling as to pre-judgment interest.

■ The Kilberg dictum did not mention the subject of interest. Judge McGohey directed that pre-judgment interest be added because he thought it likely that if the question had been considered, the New York court would have ruled in accordance with the policy expressed in section 132 of the Decedent Estate Law. A few days subsequent to denial of the motion to strike out such interest, Davenport v. Webb, 15 App.Div. 2d 42, 222 N.Y.S.2d 566 was decided.[8] This decision was affirmed by the Court of Appeals in 11 N.Y.2d 392, 230 N.Y.S. 2d 17, 183 N.E.2d 902. It will suffice to quote from that opinion the following:

"In New York, the prejudgment interest in a wrongful death action is 'part of the damages' (Cleghorn v. The Ocean Accident & Guarantee Corp., Ltd., 244 N.Y. 166, 167, 155 N.E. 87), the addition of which is governed by recourse to the usual conflicts of law rules, which we have consistently applied by not adding interest to the judgment unless *lex loci delictus* authorizes such an addition." [Citations omitted.]

The Massachusetts statute provides for the addition of interest from the date of the writ. Chapter 229, section 11.

The judgment is reversed and the cause remanded for entry of judgment in conformity with this opinion.

KAUFMAN, Circuit Judge (dissenting).

Marilyn W. Pearson, widow and administratrix of the estate of John S. Pearson, commenced the present action (on behalf of the estate) against North-

---

7. For example, in Alaska Packers Association v. Industrial Accident Commission, 294 U.S. 532, at 541, 55 S.Ct. 518, at 521, 79 L.Ed. 1044, it was pointed out that "while similar power to control the legal consequences of a tortious act committed elsewhere has been denied, * * * the liability under workmen's compensation acts is not for a tort. * * *" See also Pacific Employers Ins. Co. v. Indus-

trial Accident Commission, 306 U.S. 493, 499, 59 S.Ct. 629, 83 L.Ed. 940; Carroll v. Lanza, 349 U.S. 408, 413–414, 75 S.Ct. 804, 99 L.Ed. 1183.

8. This court came to the same conclusion as to the effect of the Kilberg dictum. St. Clair v. Eastern Air Lines, Inc., 2 Cir., 302 F.2d 477 (April 24, 1962).

east Airlines, Inc. in a federal district court (S.D.N.Y.) to recover for the death of her husband. Mr. Pearson was a passenger aboard a Northeast Airlines plane, en route from New York, N. Y. to Nantucket Island, Massachusetts. The plane crashed in the vicinity of Nantucket on August 15, 1958. After a 6 day trial a jury found that the airline's negligence was the sole and proximate cause of Mr. Pearson's death; and that Northeast Airlines was liable for the resulting pecuniary damages sustained by Mrs. Pearson. A judgment of $160,150.65 was entered for the plaintiff, including prejudgment interest calculated from the day Mr. Pearson died.[1]

On appeal, the airline does not assert that Judge McGohey committed any evidentiary errors which require reversal and a new trial. Furthermore, it does not argue that the jury's verdict was contrary to the weight of the evidence, or that its award was unjustified by plaintiff's proof of pecuniary loss. Instead, the appeal is based primarily upon the airline's assertion that Mrs. Pearson, as a matter of law, is limited to a recovery of $15,000.[2] With respect to this contention, the airline concedes, as it must, that a federal trial court sitting in a diversity jurisdiction case is required to apply the substantive law of the forum state; and that the court below correctly interpreted the applicable state law declared in 1961 by New York's highest court in Kilberg ·v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526, a case which involved an identical claim against the same airline under like circumstances (the death of one of Mr. Pearson's fellow passengers on the ill-fated flight). Furthermore, the airline agrees that Judge McGohey instructed the jury on this issue in accordance with the Kilberg decision. Thus, it would seem clear that if Mrs. Pearson had filed her complaint in the New York Supreme Court, rather than across the street in the United States District Court, the same principles of substantive law declared by the New York Court of Appeals would have been applied. Consequently, it is the airline's position that both state and federal courts would be acting unconstitutionally if they applied the conflict of laws doctrine enunciated by the New York Court of Appeals in Kilberg v. Northeast Airlines, Inc., supra, because that doctrine violates the federal Constitution's Full Faith and Credit Clause.[3] A majority of this Court agrees with the airline. I share the opinion of the New York Court of Appeals (per Desmond, Chief Judge) that the Kilberg rule is constitutionally sound. Id., 9 N.Y.2d 41–42, 211 N.Y.S.2d 137–138, 172 N.E.2d 529.

As I have indicated, no doubt is left as to the rules of substantive liability which New York courts would apply in a wrongful death action maintained for the death of a New York domiciliary in a plane crash occurring within Massachusetts borders under the circumstances of this case. In Kilberg the New York Court of Appeals voiced concern about a problem which had become increasingly important as the use of air transportation expanded, and, for various reasons, fatal accidents become more frequent. The court was concerned because "Modern conditions make it unjust and anomalous to subject the traveling citizen of this State to the varying laws of other States through and over which they

1. The Court is in agreement that a partial reduction of the amount of interest added to the jury's verdict is necessary. See majority opinion, supra. Therefore, I shall not deal with this question.

2. Appellant also contests the manner in which pre-judgment interest was computed, see n. 1, supra, and the standard used for measuring its liability. The latter issue is not resolved because it was rendered moot by the majority decision. However, it is considered in this dissent, and I have concluded that the appellant's contention on this point is without substance. See pp. 146, 147, infra.

3. U.S.Const., art. IV, § 1. See also 28 U.S.C. § 1738, which implements the constitutional provision.

[sic] move." [4]   Considering the vast air transportation network centered in New York, the court pointed out that:

"An air traveler from New York may in a flight of a few hours' duration pass through several * * * commonwealths.  His plane may meet with disaster in a State he never intended to cross but into which the plane has flown because of bad weather or other unexpected developments, or an airplane's catastrophic descent may begin in one State and end in another. *The place of injury becomes entirely fortuitous.*" *Id.* (italics added).

The opinion observed that a small number of states still retained wrongful death statutes with provisions severely limiting an airline's liability to its passengers for fatal accidents caused by its negligence.  Thus, under the *lex locus delicti* choice of law rule ordinarily used, such limitations would be applied against New York citizens when accidents occurred within the borders of those states. The court recalled that when the men who framed the New York Constitution in 1884 were urged to limit the recovery allowed for loss of human life in that state, and to incorporate a provision substantially similar to the $15,000. limit found in the Massachusetts statute,[5] the proposal was rejected as being "absurd and unjust, in measuring the pecuniary value of all lives, to the next of kin, by the same arbitrary standard."  The reaction was so strong that a provision which prohibited the legislature from enacting any such statute was adopted instead.  The opinion suggested that in the 66 years since the New York Constitution was written the absurdity and injustice of fixed limitations enacted in other states had become "increasingly apparent." Concluding that it was the duty of the judiciary to "provide protection for our own State's people against unfair and anachronistic treatment of the lawsuits" resulting from airplane disasters in those states, Chief Judge Desmond announced that henceforth New York courts would no longer apply such limitations because they were "completely contrary" to New York's public policy.[6]  Within the last few weeks, the Court of Appeals has again indicated distinctly and definitively that the principles stated in Kilberg reflect the law of New York.  See Davenport v. Webb, 11 N.Y.2d 392, 230 N.Y. S.2d 17, 183 N.E.2d 902.  And the court also has stated with unmistakable clarity that the Kilberg decision rests exclusively upon the considerations of public policy which I have described.[7]

At the threshold of my consideration of the constitutional implications of the Kilberg decision, I pause to note that Kilberg did not work any revolution in traditional conflict of laws philosophy.  The case involved nothing more than a particular application of a doctrine well established in New York and elsewhere that a state may refuse to apply principles of substantive law "borrowed" from other states in accordance with

4.  Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 39, 211 N.Y.S.2d 135, 172 N.E. 2d 527.

5.  Massachusetts has since amended its law to permit a recovery up to $20,000.  Mass. Gen.Laws Ann. ch. 229, § 2.

6.  Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 39, 211 N.Y.S.2d 135, 172 N.E.2d 527.

7.  In Davenport v. Webb, supra, the plaintiffs-appellants argued that rules concerning pre-judgment interest were "procedural" because they merely affected the measure of damages, so that New York procedural law should be applied regardless of *lex locus delicti.*  The Court of Appeals rejected this argument as follows:

"Plaintiffs point to language in the Kilberg opinion to the effect that 'it is open to us * * * to treat the measure of damages in this case as being a procedural or remedial question controlled by our own state policies' (9 N.Y.2d, supra, at pp. 41–42, 211 N.Y.S.2d at p. 135, 172 N.E.2d at p. 527).  In Kilberg the court was confronted with a question of state public policy requiring decision.  Kilberg * * * must be held merely to express this state's strong public policy with respect to *limitations* in wrongful death actions."  Id at 230 N.Y.S.2d at p. 19, 172 N.E.2d at p. 904.

standard choice of law rules, when the foreign principles conflict with some fundamental public policy of the forum. See Stumberg, Conflict of Laws 198 (2 ed. 1951); Coster v. Coster, 289 N.Y. 438, 442, 46 N.E.2d 509, 512, 146 A.L.R. 702 (1943); Mertz v. Mertz, 271 N.Y. 466, 473, 3 N.E.2d 597, 599, 108 A.L.R. 1120 (1936); Hartness v. Aldens, Inc., 301 F.2d 228 (7th Cir. 1962).[8] Moreover, as revealed in a comprehensive analysis of the "public policy" concept as it pertains to choice of law rules,

"All the commentators would retain the public policy principle in conflicts to the extent that it is grounded in basic moral conceptions or in ideas of fundamental justice, and we agree. If the foreign law normally applicable violates the strongest moral convictions or appears profoundly unjust at the forum, the law should not be applied. The principle can be defended on the ground that above all, any court's job is to aim at the just accommodation of controversy or, perhaps, with the notion that the decisions of courts should not 'exhibit to the citizens of the state an example pernicious and detestable.' [Greenwood v. Curtis, 6 Mass. 358, 378 (1810)]." Paulsen and Sovern, "Public Policy" in the Conflict of Laws, 56 Colum.L. Rev. 969, 1015 (1956).

Whether the "public policy" doctrine has been used in order to avoid necessary reevaluation of outmoded and inadequate choice of law rules, a criticism suggested by Professors Paulsen and Sovern, or, as Professor Cavers has observed, whether it is used as an avenue of escape from mechanical rules creating injustice, see Cavers, A Critique of the Choice-of-Law Problem, 47 Harv.L.Rev. 173, 183 (1933),

"It is apparent * * * that in most cases the choice of local rather than foreign law [because of "public policy"] cannot be regarded simply as a matter of parochialism. The common invocation of the public policy argument is * * * an assertion of the forum's right to have its law applied to the transaction because of the forum's relationship to it." Paulsen & Sovern, op. cit. supra, at 981.

In Kilberg, the New York Court of Appeals, in essence, made precisely that assertion. The court continued to recognize a number of Massachusetts substantive rules incidental to plaintiff's claim, and thereby paid lip service to the lex locus delicti rule. But its refusal to recognize the "entirely fortuitous" circumstance of an airplane's fatal descent into Massachusetts territory as compelling an application of an "absurd and unjust" limitation (which would result in "anachronistic" treatment of lawsuits for wrongful death in New York courts) is best explained as an assertion of New York's right to apply its own "internal" law to this issue. See Paulsen & Sovern, supra, at 980–981, 992–998.

This brings us to what I consider the fundamental error in the holding in this case. Although the majority does not explicitly declare that New York could not choose to ignore the Massachusetts wrongful death statute in its entirety, and that New York was forbidden from applying a form of New York "internal" law in the present case, I believe its holding must lead us to that position. The reference to First National Bank of Chicago v. United Air Lines, Inc., 342

8. Massachusetts courts were among the first in this country to use the public policy concept when foreign law was repugnant to fundamental tenets of that state's jurisprudence. See Greenwood v. Curtis, in the Paulsen and Sovern article quoted above. In Blanchard v. Russell, 13 Mass. 1, 6 (1816), the court said that " * * * the judicial power will exercise a discretion with respect to the laws they may be called upon to sanction; for, if they should be manifestly unjust, or calculated to injure their own citizens, they ought to be rejected." See Higgins v. Central New England & W. R. Co., 155 Mass. 176, 29 N.E. 534 (1892); Jackson v. Anthony, 282 Mass. 540, 185 N.E. 389 (1933).

U.S. 396, 400, 72 S.Ct. 421, 96 L.Ed. 441 (1952), in which Justice Jackson asked by way of rhetorical question whether the Constitution prevents a forum state from applying its own law where "a transaction is so associated with one jurisdiction" (i. e., another state), reinforces my belief that the majority has decided that the law of *lex locus delicti* must under all circumstances be applied to define liability. This conclusion is given added strength by other references to language in opinions by Justice Holmes in two early cases (1904) [9] suggesting that foreign law, "the source of the obligation" upon which a plaintiff "absolutely" depends, must be applied in its entirety. Moreover, I would suppose that if the majority agreed that New York *could* ignore Massachusetts law in its entirety, because (a) it chose to apply its own "internal" law to a transaction having substantial New York contacts, or (b) because Massachusetts law is repugnant to its public policy (which is probably another way of saying the same thing insofar as Kilberg is concerned), it would necessarily have to agree that New York could apply Massachusetts rules *except* for the obnoxious limitation on the amount of recovery.

If this analysis of the Court's decision is correct, the *ratio decidendi* may be stated as follows: The crash of the airplane in which Mr. Pearson was traveling created certain unalterable rights against Northeast Airlines, fixed at the instant of the disaster, and definable exclusively in terms of then existing Massachusetts law, which may be enforced wherever Northeast Airlines is found—

but only as permitted by the Massachusetts legislature.

Concisely stated in this manner, the decision is immediately recognized as nothing more than an application of the "vested rights" doctrine of territorial sovereignty. This doctrine, popular among conflict of laws theorists in the late 19th and early 20th Century, was given color of respectability by Justice Holmes in the two cases (cited by the majority) decided almost a half century ago. But the highly refined conceptualism which at one time was considered satisfactory by some authorities, has long since ceased to command any appreciable support, and has been discarded in modern jurisprudence.[10] Indeed, the rejection of the "vested rights" doctrine began as early as 1923, in a classic opinion by Judge Learned Hand, who stated that,

" * * * no court can enforce any law but that of its own sovereign, and, when a suitor comes to a jurisdiction foreign to the place of the tort, he can only invoke an obligation recognized by that sovereign. A foreign sovereign under civilized law imposes an obligation of its own as nearly homologous as possible to that arising in the place where the tort occurs." Guinness v. Miller, 291 F. 769, 770 (S.D.N.Y.1923), aff'd, 299 F. 538 (2d Cir. 1924), aff'd sub nom. Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925).

The sound reasoning employed in 1923 by Judge Hand, which today seems little more than a statement of the obvious, and the manifest inconsistency and in-

9. Slater v. Mexican National R. R. Co., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904); Davis v. Mills, 194 U.S. 451, 24 S.Ct. 692, 48 L.Ed. 1067 (1904).

10. See Cavers, Comment: The Two "Local Law" Theories, 63 Harv.L.Rev. 822, 823 n. 4 (1950) for an explanation of the "vested right" theory and the criticism by Judge Hand and Professor Cook which led to its rejection.

It is important to note that even Justice Holmes rejected the earlier thesis, advanced by Justice Story, that foreign law actually operates in the forum. See Story, Conflict of Laws, § 23 (8 ed. 1883). Holmes merely proposed that the liability creating event "gave rise to an obligation, an *obligatio*, which, like other obligations, follows the person, and may be enforced, wherever the person may be found." Slater v. Mexican National R. R. Co., supra at 126, of 194 U.S., at 583 of 24 S.Ct.

flexibility of the "vested rights" doctrine itself, see Cheatham, American Theories of Conflict of Laws: Their Role and Utility, 58 Harv.L.Rev. 361, 379–385 (1945) has resulted in its virtual abandonment. As Justice Black recently pointed out, choice of law rules founded on the "vested rights" doctrine have been "repudiated by courts and commentators everywhere * * *, especially as * * * constitutional rule[s]." [11]

Thus, it is too late to argue that for conflict of law purposes, New York courts *enforce* Massachusetts law, or "transitory" obligations (in the Holmes sense) arising from it. In Kilberg, as in the present case (in which a federal court,

with respect to the substantive law applied, is merely another New York court), the forum "enforces not a foreign right but a right created by its own law." Cook, The Logical and Legal Basis of the Conflict of Laws, 20–21 (1942). And the constitutional question is not whether Northeast Airlines is "unjustly" deprived of the "protection" of Massachusetts law—which is not being "enforced." See Hartness v. Aldens, Inc., supra. It is whether New York has sufficient interest in this multistate transaction [12] so that it may adopt a conflict of laws doctrine which utilizes legal principles modeled on an internal statutory scheme,[13] but created by the state's judi-

11. Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 220, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960) (dissent); see Zogg v. Penn Mutual Life Insurance Co., 276 F.2d 861, 865 (2d Cir. 1960): "[T]he Supreme Court has * * * rejected conceptualistic theories based upon the territoriality of vested rights, adopting instead an approach which looks to the state's governmental interest in the * * * transaction."

12. The forum state's interest in the multistate transaction may be relevant not only to the state's constitutional right to apply its own law, but to its choice of law, if it follows some version of the "significant contacts" theory, see Cavers, A Critique of the Choice-of-Law Problem, 47 Harv.L.Rev. 173 (1933) rather than mechanical choice of law rules based on certain facts. In Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954) the New York Court of Appeals abandoned mechanical choice of law rules which depended on the "place of contracting" or the "place of performance" in the area of contract law. And this court has already noted that Kilberg may represent "something in the nature of the Auten rule" as applied to tort cases. Hausman v. Buckley, 2 Cir., 299 F.2d 696, 704 (1962).

But federal courts in diversity jurisdiction must apply state choice of law rules whether they are deemed wise or unwise. Therefore my consideration of New York's interest in this multistate transaction is confined to the constitutional question, although there is necessarily an overlapping on the choice of law issue as well. A *caveat* is in order: there may be sufficient "contracts" to give New York the constitutional *power* to apply its own

law, although the "contacts" are insufficient to make such action wise as a matter of conflict of laws policy. It is true here, as in other areas of the law, that the Constitution can permit a state to do something that is unwise or undesirable.

13. As the majority correctly states, the Court of Appeals in Kilberg did indicate that Massachusetts rules of liability were not being discarded except for the $15,000. limitation. Moreover, since both New York and Massachusetts authorized wrongful death suits against common carriers, the court did not have to decide whether it was applying the New York statute on the single issue of limitation, or whether it was creating a common law for the case. See Kilberg v. Northeast Airlines, Inc., supra n. 6. However, in Davenport v. Webb, supra, the court indicated a continuing belief that the New York statute does not extend to accidents occurring within the geographical borders of another state. 61 Colum.L.Rev. 1497, 1509 (1961).

Although this is true, it may still be argued that in Kilberg, by striking one of the Massachusetts rules governing liability, the court left a vacuum on the question of limitation which could not prevent a plaintiff from recovering in excess of the missing $15,000. limit. A more attractive explanation is that once the court struck the limitation provision, it filled the resulting void with a rule of law allowing unlimited recovery, created by the court on the model of the New York wrongful death statute. Although this may be a matter of semantics, since the result is the same under either analysis, I have chosen the latter theory because it is more conducive to the constitutional analysis.

ciary. As one of our leading students of this subject has concluded on the basis of an exhaustive review of the relevant Supreme Court cases through 1958, "a state court's choice of law will be upset under the Full Faith and Credit Clause or the Due Process Clause [14] only when the state whose law is applied has no legitimate interest in its application." Currie, The Constitution and the Choice of Law: Governmental Interests and the Judicial Function, 26 U.Chi.L.Rev. 9, 75 (1958).[15] And the validity of Professor Currie's conclusion has been demonstrated by a recapitulation of case law made by Chief Justice Warren, speaking for a unanimous court in the recent case of Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962):

> "Where more than one state has sufficiently substantial contact with the activity in question, the forum state, by analysis of the interests possessed by the states involved, could constitutionally apply to the decision of the case the law of one or another state having such an interest in the multistate activity."
> Id., at 15, at 594 of 82 S.Ct.

Therefore, the precise question which must be decided in this case is whether New York has a "sufficiently substantial contact" with the events surrounding the action maintained by Mrs. Pearson for the death of her husband in this particular airplane crash.

It is not yet entirely clear what contacts are sufficient to permit a state to apply its own substantive law to a wrongful death action where the physical impact causing death occurs in another jurisdiction. Cf. Note, 74 Harv.L.Rev. 357, 388 (1960). The majority, by its failure to analyze the various interests found in the present case, would seem to indicate that only the existence of "impact" within a state's borders results in a contact substantial enough to withstand constitutional objection. But it is perfectly clear that the *lex locus delicti* doctrine has not been incorporated into the fundamental law of the land by virtue of the Full Faith and Credit Clause. In Richards v. United States, supra, the Supreme Court held that *either* the state in which impact occurs—usually considered the locus of the tort,[16] *or* (when different) the state in which the wrongful act or omission occurs, may constitutionally apply its wrongful death law to the transaction. Thus, it is immediately perceived that the majority decision is

14. Although the majority opinion does not discuss appellant's assertion that application of the Kilberg rule in this case would deprive it of due process of law, the close relation between that argument and appellant's argument under the Full Faith and Credit Clause leaves no doubt that if considered, the majority would find a due process violation as well. "The areas in which these two clauses operate are not coterminious * * * Yet * * * the degree of overlap is large * * * because the essential principle underlying the operation of both clauses is the same; neither interferes with choice of law except when the law applied is that of a state having no legitimate interest in the application of its policy to the case at hand." Currie, op. cit. supra at 15. See Watson v. Employers Liability Assurance Corp., Ltd., 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954); Weintraub, Due Process and Full Faith & Credit Limitations in a State's Choice of Law, 44 Iowa L.Rev. 449 (1959).

Finding as I do that application of Kilberg to this case does not violate the Full Faith and Credit Clause, I also reject the due process argument on essentially the same grounds, although it seems inappropriate under the circumstances to elaborate on that issue in any detail.

15. Professor Reese has written of the constitutional limitations on a state's choice of law: "Due process no longer forbids a state from applying its own law unless it has no reasonable contact with the transaction, and, where such a reasonable contact exists, full faith and credit does not compel a state to apply another's law in preference to its own." Reese, Full Faith and Credit to Statutes: The Defense of Public Policy, 19 U.Chi.L.Rev. 339, 342 (1952).

16. Restatement, Conflict of Laws, § 377, comment (a), Note (1), contains this illustration: "A, standing in state X, fires a gun and lodges a bullet in the body of B who is standing in state Y. The place of wrong is in Y."

wholly undermined unless it is construed to permit application of the Kilberg rule in a situation where there is proof that a crash resulted from negligent maintenance of the airplane at its New York terminus. With respect to the present case, in which plaintiff pursued a different theory of negligence, there are other substantial interests. For instance, a persuasive argument can be made that New York has an interest in requiring Northeast Airlines to maintain safe facilities elsewhere. The contention could be summarized as follows: Northeast Airlines is a foreign corporation authorized to do business in New York. Pursuant to that authorization, it maintains ticket offices throughout the state, and actively promotes the use of its transportation facilities by New York citizens by widespread advertising and special fares between New York City and cities in other states. It operates a full schedule of flights from New York airports, where it offers various additional conveniences intended to attract patrons from competing airlines. As a result of this business activity, it earns a substantial amount of revenue from New York citizens. Is it unreasonable to suggest that New York, in order to protect its citizens from avoidable dangers which may result in loss of life, e. g., inadequate facilities maintained by the airline in the states to which it transports New York citizens, should promote safety practices by rendering the airline liable for the consequences of such negligence *in the same manner that New York holds airlines liable for negligent acts committed within its borders*? One of the

principal justifications of tort liability is its expected effect upon the standard of care used in hazardous operations.[17] Does the majority suggest that New York has any less interest in the airline's safety practices when a plane operating out of a New York airport flies a great distance over New York territory only to crash a few miles outside of its borders (because the crew was negligent seconds after crossing the state line) than it would if the negligence occurred a few moments earlier? [18] Yet we are told that if the negligence occurred moments before in New York, that state could apply its own law regardless of the place of the crash. See Richards v. United States, supra. As the New York Court of Appeals pointed out in Kilberg, the reality of air transportation has emptied such distinctions of real meaning.

In the present case Mr. Pearson, a New York citizen, boarded the airplane at a New York airport, after buying a ticket at the airline's New York offices. On the theory suggested above, New York's contact with this series of events is clear enough, and its interest in preventing negligence which would cause the airplane to crash is self-evident. By contrast, since there is no suggestion of negligence after the crash and no damage to persons or property on the ground "it is doubtful that the application of the Massachusetts wrongful death act in a case such as this * * * would have any real effect on conduct within that state." 74 Harv.L.Rev. 1652, 1654 (1961). Certainly Massachusetts did not expect to reduce the airline's insurance rates by means of its statute. Northeast

17. See Holmes, Common Law, 144 (1 ed. 1881).

18. Suppose a New York citizen embarks on a flight operated by a foreign corporation (a citizen of another state having the same public policy with respect to limitation of damages as New York) between two cities in New York, e. g., New York City and Albany. The airline chooses a route that carries the plane over Massachusetts territory for part of the trip. During that brief period the crew is negligent and the plane crashes in the Berk-

shire Mountains of Massachusetts. Must New York apply the limitation found in Massachusetts law although that state had no connection with the event, except for the fortuity of a moment's negligence and the proximity of its mountains to Albany, when every other contact is found in New York? Aside from the airline's interest in the financial benefits of Massachusetts law, and that of its insurance company, it is difficult to perceive how such a rule enforces "the strong unifying principle embodied in the Full Faith and Credit Clause."

Airlines operates in many states, and could suffer accidents in any of them.

However, we need not speculate whether New York may constitutionally use its tort law to deter an airline from out of state negligence intimately connected with its New York operation. New York has a well recognized interest in the nature and amount of recovery obtained by dependents of the decedent in a situation such as this, regardless of the place of injury, because the dependents are its own domiciliaries. Wrongful death statutes have their primary justification in state recognition of the wrong inflicted upon the wife and children who remain behind after the death of the breadwinner, and its concern for their future welfare. 74 Harv.L.Rev. 1652, 1653 (1961). In this respect, the instant case presents an even stronger argument for the Kilberg rule than the Kilberg case itself, in which it is not clear that Mr. Kilberg's dependents were New York domiciliaries.[19] Furthermore, New York's interest in the welfare of its domiciliaries extends beyond the economic and human loss which *they* sustain, since New York has assumed a duty to provide for those unable to maintain themselves. See N.Y. Soc.Welfare Law § 131–51.

In Alaska Packers Ass'n v. Industrial Acc. Comm. of Calif., 294 U.S. 532, 542, 55 S.Ct. 518, 79 L.Ed. 1044 (1935), the Supreme Court permitted California to compel an employer to pay workmen's compensation to an alien who was injured outside that state in the course of his employment, when the alien's closest contacts were with California. The court noted that unless California made such a remedy available, injured persons such as the alien claimant " * * * would be remediless, and there was the danger that they might become public charges, both matters of grave public concern to the state." A state's interest in protecting its resident domiciliaries is no less than its interest in protecting resident aliens; and analogous considerations suggest that the dependent's domicile has a constitutionally supportable interest in having its wrongful death policy applied. Cf. Note, 74 Harv.L.Rev. 357, 389 (1960).

Further evidence of the importance of plaintiff's domicile as a contact permitting application of the domiciliary state's law is found in Richards v. United States, supra. When the Supreme Court spoke of interests which would permit a state to apply its wrongful death statute to injuries sustained out-of-state, it cited, and thus apparently approved, *inter alia,* Grant v. McAuliffe, 41 Cal.2d 859, 264 P.2d 944, 42 A.L.R.2d 1162 (1953) where the forum's law as to survival of actions was applied to one resident's suit against another resident's estate because of an accident which occurred outside the state. It also similarly approved Haumschild v. Continental Cas. Co., 7 Wis.2d 130, 95 N.W.2d 814 (1959), which applied the domicile state's law as to interspousal immunity to a tort committed outside the state. See also Paulsen & Sovern, op. cit. supra at 994–998. Finally, in Hughes v. Fetter, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951), a case cited by the majority because of its holding that Wisconsin could not refuse to entertain a wrongful death action based on the law of another state (under its choice of law rules) since Wisconsin had a similar statute of its own. Compare Hartness v. Aldens, Inc., supra. The Court explicitly distinguished that situation from a hypothetical one in which Wisconsin merely applied its own law:

> "The present case is not one where Wisconsin, having entertained appellant's lawsuit, chose to apply its own instead of Illinois' statute to measure the substantive rights involved. This distinguishes the present case from those where we have said that 'Prima facie every state is entitled to enforce in its own courts its own statutes, lawfully enacted.' Alaska Packers Ass'n v. Commission, 294 U.S. 532, 547 [55 S.Ct. 518, 79 L.Ed. 1044]"; 341 U.S. 612, n. 10, 71 S.Ct. 982.

19. See 61 Colum.L.Rev. 1497, 1511 (1961).

I believe this passage from Hughes clearly implies that *prima facie* it would have been constitutional if Wisconsin applied its own wrongful death law to the out-of-state accident involved there. Even if this were not true, the case affords no comfort to the majority position. While New York has no antagonism to wrongful death actions, but only to limitation of liability, New York (unlike Wisconsin) does not close its doors to suits based on Massachusetts rules, but merely refuses to recognize the limitation. Hughes v. Fetter is therefore distinguishable because the "crucial factor" which led to that decision, "that the forum laid an uneven hand on causes of action arising within and without the forum state," is not present. Wells v. Simonds Abrasive Co., 345 U.S. 514, 518, 73 S.Ct. 856 (1953).

The majority dismisses the Wells case as being unpersuasive in the case at bar. In Wells, the Supreme Court manifested obvious willingness to allow states broad power in choice of law matters within the framework of the Full Faith and Credit Clause. The court held that Pennsylvania could apply its own statute of limitations as a bar to a wrongful death action based on Alabama rules of substantive liability (because the impact was in Alabama), although Alabama had provided a longer statute of limitations in the same statute that created the cause of action. As the Wells opinion recognized, and as this Court has explained, a "built-in" statute of limitations such as that found in the Alabama wrongful death statute is generally considered part of the substantive law of liability. Thus, Wells cannot be distinguished on the grounds that a statute of limitations is merely procedural, and the forum applies its own procedure. See Hausman v. Buckley, 299 F.2d 696, 701 (2d Cir. 1962). Nor is the majority's attempt to distinguish Wells on the theory that a plaintiff can choose any forum (presumably the forum with the longest statute of limitations), whereas the defendant "will be treated unjustly" if deprived of the "protection" of Massachusetts law. Implicit in the Wells decision was a holding that Pennsylvania could apply its own statute of limitations even if it were longer than that provided in the Alabama statute. The Supreme Court explicitly and without qualification stated that the "minimum requirements" of the Full Faith and Credit Clause do not "compel the forum state to use the period of limitation of a foreign state." 345 U.S. 516–517, 73 S.Ct. 856. And see the dictum by Justice Brandeis in Home Ins. Co. v. Dick, 281 U.S. 397, 409, 50 S.Ct. 338, 74 L.Ed. 926 (1930): "It is true that a State may extend the time within which suit may be brought in its own courts * * * And * * * the local statute of limitation may be applied to a right created in another jurisdiction even where the remedy in the latter is barred." If Pennsylvania could allow a plaintiff to recover for wrongful death under Alabama rules, although Alabama, the *lex locus delicti* would permit *no recovery whatever*, how does New York violate the constitution when it merely refuses to follow a Massachusetts limit *on the amount of recovery?* Moreover, as I have already pointed out, Northeast Airlines is not being "deprived" of any legitimate defense. The application of only one state's law to a dispute "serves no federal end other than fulfilling the justifiable expectations of the parties and preventing forum shopping." 74 Harv.L.Rev. 1652, 1655 and authorities cited in n. 24. As I have also noted, Northeast Airlines must be prepared for losses resulting from accidents in any of the states in which it operates aircraft; it does not, and obviously could not rely on the fortuity of a Massachusetts crash. A short answer to the objection against forum shopping is that such considerations were not believed to be of constitutional stature by the Supreme Court in Wells. A more elaborate response would suggest that while possible forum shopping is a consideration relating to selection of one choice of law rule rather than another, it is not the only consideration. Clearly a state should be able to define the basic ends for which its judicial sys-

tem may be used. There is nothing in the Constitution which renders the judiciary of New York or any other state in this country similarly situated impotent because Massachusetts adheres to a policy which they find to be "absurd and unjust." Hartness v. Aldens, Inc., supra. As Lord Ellenborough said in that classic protest against unwarranted extension of a sovereign's power, "Can the island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?" Buchanan v. Rucker, 103 Eng.Rep. 546, 547 (K.B. 1808). The states have not surrendered their legitimate interests in multistate activities to the extent the majority has declared. And, "in the tort action before us, there is little reason to impose a 'state of vassalage' on the forum."[20]

It is significant that in a number of cases this Court has applied the choice of law rule announced in another recent decision by the New York Court of Appeals. See Auten v. Auten, 308 N.Y. 155, 159–61, 124 N.E.2d 99, 101–02, 50 A.L. R.2d 246 (1954). The Auten case has replaced mechanical choice of law rules formerly used in the field of contract law with the more modern "significant contacts" theory. Under the new rule it is possible that a contract entered into by two parties in Massachusetts will be governed by the contract law of New York because, at the time an action on the contract is brought, New York has more significant contacts with the transaction. This result is possible even though the parties never supposed that New York law would apply when the contract was written. See e. g., Zogg v. Penn Mutual Life Ins. Co., supra, n. 11. It is difficult to understand how my brothers in the majority, who participated and concurred in a number of the previous decisions of this Court applying the Auten rule, see cases cited in Hausman v. Buckley, supra,

299 F.2d at 704, n. 12,[21] are now concerned about the constitutionality of the Kilberg rule—because it deprives a tortfeasor of the benefits of a law upon which the tortfeasor could not rely.

Since Auten, by contrast, will often result in the application of the contract law of a state upon which parties did in fact rely, the present decision seems to suggest that Auten will also be sent to its demise because of some conflict with inexplicable considerations purportedly derived from the "unifying principle" of the Full Faith and Credit Clause. If this is true, I am concerned that experimentation in the field of conflict of laws will come to an abrupt end. As adroitly stated by a leading constitutional authority, Professor Paul A. Freund,

> "If the task of Conflict of Laws is to understand, harmonize, and weigh competing interests in multistate events, and if the desideratum of uniformity will be approached most satisfactorily by evolving rules that deliberately seek these objectives, then we seem to be hardly ready for a set of precepts imposed in the process of Supreme Court decision as fixed canons of constitutional law." Freund, Chief Justice Stone & the Conflict of Laws, 59 Harv.L.Rev. 1210, 1235–36 (1946).

I believe that the dull conformity which may result from the use of the Full Faith and Credit Clause as a straitjacket confining the body of conflict of laws doctrine is far less desirable than the results which may be achieved by a more flexible interpretation of the Constitution. See Note, 30 N.Y.U.L.Rev. 984, 992 (1955).

One additional problem remains to be considered. Judge McGohey refused to apply the Massachusetts standard of measuring damages, which bases an award on the degree of the defendant's culpability rather than the extent of the

---

20. Hughes v. Fetter, supra, 341 U.S. at 617, 71 S.Ct. at 985 (Frankfurter, J. dissenting).

21. In at least one instance the Auten rule was "borrowed" in the formulation of "federal common law." Purofied Down Products Corp. v. Travelers Fire Ins. Co., 278 F.2d 439 (2d Cir. 1960).

pecuniary loss sustained by the dependents (which is the New York standard). Appellant argues that Kilberg does not require such disregard of the Massachusetts rule. I disagree. Although New York has no policy against an award of pre-judgment interest from the date of the serving of a writ (Mass.) rather than the date of death (N.Y.), see Davenport v. Webb, supra, its policy against limitations on the amount of damages is necessarily applicable with like force to the standard by which the amount of damages is calculated.

The Supreme Court has pointed out in a converse situation involving the applicability of the limitation provision of the Massachusetts law, " * * * where punitive damages only are allowed for wrongful death, a limitation on the amount of liability has no relevance to the policy of placing limits on liability where damages are only compensatory." Massachusetts Bonding & Ins. Co. v. U. S., 352 U.S. 128, 133, 77 S.Ct. 186, 1 L. Ed.2d 189 (1956). Similarly, having dispensed with the limitation, the culpability standard has no meaning. Under the Massachusetts rule, although the defendant has breached his duty of due care, the jury may award a minor amount of damages because the negligence was, so to speak, "not too bad." A jury may be able to determine (by some vague and indefinite standard) the effect of relative degrees of culpability on the amount to be awarded, because, presumably, $15,-000. represents the amount to be awarded where the worst behavior causes death. See Massachusetts Bonding & Ins. Co. v. U. S., supra. But the application of the Massachusetts standard when there is no limit on the amount of recovery can only result in a purely speculative award. Moreover, the standard of culpability, by its total disregard for the injury actually sustained by the decedent's dependents, violates the primary purpose of most wrongful death legislation, including that of New York, which is concern for the pecuniary loss of the beneficiaries who remain behind. See 2625, supra.

Thus, Congress rejected it as a basis for measuring federal government liability for wrongful deaths resulting from negligence of its employees in Massachusetts. Massachusetts Bonding & Ins. Co. v. U. S., supra. For these reasons, I believe that New York courts would not apply the Massachusetts culpability standard, and would adopt the pecuniary loss standard used by Judge McGohey on an analogy to the New York statute.

Therefore, I would affirm the judgment below, with such modification of the award for interest as may be required.

