Marilyn W. PEARSON, as Administratrix of the Goods, Chattels and Credits of John S. Pearson, Deceased, Plaintiff-Appellee,

v.

NORTHEAST AIRLINES, INC., Defendant-Appellant.

No. 297, Docket 27350.

United States Court of Appeals Second Circuit.

Argued before the Panel April 11, 1962.

Panel Decision July 11, 1962.

Rehearing en Banc Ordered Sept. 13, 1962.

Rehearing en Banc Decided Nov. 8, 1962.

Haight, Gardner, Poor & Havens, New York City (William J. Junkerman and Douglas B. Bowring, New York City, of counsel) for defendant-appellant.

Frank G. Sterritte, and Speiser, Shumate, Geoghan & Law, New York City (Stuart M. Speiser and Florindo M. De-Rosa, New York City, of counsel) for plaintiff-appellee.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge, with whom CLARK, WATERMAN, SMITH, HAYS and MARSHALL, Circuit Judges, concur.

The principal question considered by this Court *en banc* is whether a federal court sitting in the state of New York may constitutionally "apply" a Massachusetts statute giving a cause of action for wrongful death and refuse, for reasons of state policy, to follow a provision of that statute which would limit the plaintiff's recovery to $15,000. The question arises in an action for wrongful death occasioned by a plane crash in Massachusetts. The action was brought in the United States District Court for the Southern District of New York, and

was tried before Judge McGohey. The judge ruled that plaintiff's recovery was not bound by the arbitrary limit of $15,-000 provided by Chapter 229, section 2, of the Massachusetts General Laws.[1] In so doing he relied on the holding of the New York Court of Appeals, in Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961). The jury thereafter awarded damages well in excess of the statutory maximum and judgment was entered accordingly.[2] From this adverse judgment, the defendant airline appealed to this Court, claiming, *inter alia*, that the recovery should have been limited, as a matter of law, in accordance with the Massachusetts statute. The appeal was first heard by a panel of this Court consisting of Chief Judge Lumbard, Judge Swan and this writer. A majority of that panel held, over my dissent, that the Full Faith and Credit Clause of the United States Constitution[3] barred New York courts, and a federal court hearing an action brought in New York by virtue of diversity jurisdiction, from awarding unlimited recovery in a lawsuit "based" upon the Massachusetts statute.[4] The issue being one of great significance—the constitutional power of the states to develop conflict of laws doctrine—it was ordered, upon application by the plaintiff-appellee and the affirmative vote of a majority of the active judges of this circuit, that the appeal be reheard *en banc*.[5]

1. Pearson v. Northeast Airlines, Inc., 199 F.Supp. 539 (S.D.N.Y.1961).

This section of the Massachusetts General Statutes reads: "Damages for death by negligence of common carrier. If the proprietor of a common carrier of passengers * * * causes the death of a passenger, he or it shall be liable in damages in the sum of not less than two thousand nor more than fifteen thousand dollars, to be assessed with reference to the degree of culpability of the defendant or of his or its servants or agents, and recovered and distributed as provided in section one, and to the use of the persons and in the proportions, therein specified."

The statute has since been amended to raise the upper limit of recovery to

$20,000. Mass.Gen.Laws Ann.Ch. 229, § 2 (Supp.1961).

2. The jury brought in a verdict in the sum of $134,043.77. The court's judgment was later amended to include an additional $26,160.88 of interest.

3. Article IV., Section 1. "Full Faith and Credit shall be given in each State to the Public Acts, Records, and Judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

4. Pearson v. Northeast Airlines, Inc., 307 F.2d 131 (2d Cir., 1962).

5. See 28 U.S.C. § 46(c) (1958).

■■ As a consequence of this re-hearing and extensive reconsideration of the issues and pertinent authorities, six active judges of this Court have reached a conclusion contrary to that of the majority of the original panel, and adopt this writer's dissent from the opinion of the panel, appearing at 307 F.2d 136 (1962). We hold that the ruling of the New York Court of Appeals in Kilberg was a proper exercise of the state's power to develop conflict of laws doctrine; and the court's refusal to apply the limitation of recovery provision in the Massachusetts statute a constitutional exercise of such power. The judgment of the District Court is therefore affirmed, as modified in accordance with the panel's unanimous holding on the issue of pre-judgment interest. This issue requires no further discussion.[6]

Several additional considerations which we shall discuss, convince us that the conclusion we have reached is compelled.

The essential facts are not in dispute. Marilyn W. Pearson, widow and administratrix of the estate of John S. Pearson, and a citizen and domiciliary of New York, commenced the present action against Northeast Airlines, Inc. to recover damages for the death of her husband, allegedly caused by the defendant's negligence. Northeast Airlines is a Massachusetts corporation authorized to do business in New York. Pursuant to that authorization, it maintains ticket offices throughout the state, and actively promotes the use of its transportation facilities by New York citizens by means of widespread advertising. It operates a full schedule of flights from New York airports and earns a substantial amount of revenue from New York citizens. The decedent, a New York citizen and domiciliary, purchased his flight ticket at the New York offices of Northeast Airlines. He boarded the Northeast plane at La Guardia Airport, in the City of New York, bound for Nantucket Island, Massachusetts, and on the evening of August 15, 1958, the decedent's plane crashed in the vicinity of Nantucket.

Another action, having no connection with the Pearson family, had already been maintained in the courts of the State of New York by the administrator of Edward J. Kilberg, also a passenger on the same ill-fated flight to Nantucket.[7] The highest court in New York ruled in that case that the action, by virtue of New York choice of law rules, was properly founded upon the liability created by the Massachusetts Wrongful Death Act. It stated, however, that New York courts should, if appropriate, award damages in excess of the statutory $15,000 maximum recovery required by the Massachusetts statute. Fundamental New York policy, given expression by a state constitutional provision prohibiting the New York legislature from enacting any such limitation, was held to prevent New York courts from applying the limitation by means of court-made law. The court emphasized that the limitation was deemed by the 1894 drafters of the state constitution to be "absurd and unjust, in measuring the pecuniary value of all lives, to the next of kin, by the same arbitrary standard."[8] In effect, the Court of Appeals of the State of New York, in Kilberg, fashioned a rule of law allowing recovery of damages without arbitrary limit, modeled on the New York

6. See 307 F.2d at 136.

7. Kilberg v. Northeast Airlines, Inc., supra.
 This case has, in the short period of time since its resolution, garnered an inordinately large amount of space in legal periodicals. See 25 Albany L.Rev. 313; 15 Ark.L.Rev. 187; 41 B.U.L.Rev. 257; 27 Brooklyn L.Rev. 336; 49 Calif.L.Rev. 187; 61 Colum.L.Rev. 1497; 46 Cornell L.Q. 637; 30 Fordham L.Rev. 170; 49 Geo.L.J. 768; 74 Harv.L.Rev. 1652; 36 N.Y.U.L.Rev. 723; 37 Notre Dame Lawyer 194; 15 Rutgers L.Rev. 620; 35 St. John's L.Rev. 357; 12 Syracuse L.Rev. 395; 28 U.Chi.L.Rev. 733; 39 U.Cin.L.Rev. 511; 15 Vand.L.Rev. 271; 47 Va.L.Rev. 692.

8. See Medinger v. Brooklyn Heights R. R. Co., 6 App.Div. 42, 46, 39 N.Y.S. 613, 616 (1896).

Wrongful Death Statute,[9] although the Massachusetts statute still served as the foundation for plaintiff's cause of action for wrongful death. Judge McGohey, constrained by the edict of Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), properly applied the principles of New York conflict of laws enunciated in Kilberg and declined to recognize the Massachusetts limitation upon liability.

This writer has already criticized the argument apparently adopted by the panel opinion, that New York was constitutionally disabled from applying its own substantive rules of law to a cause of action arising out of a plane crash in Massachusetts. See dissent, 307 F.2d at 136. Although Judge Swan did not expressly approve this proposition of constitutional law, the inference seemed inescapable that, in effect, the panel majority had exalted the *lex loci delictus* to constitutional status with the consequence that New York was barred from applying the whole or any part of its own wrongful death policy to the events occurring in Nantucket.[10] If this is indeed the rationale of the panel's opinion, then it is the first decision to "freeze" into constitutional mandate a choice-of-law rule derived from what may be described as the Ice Age of conflict of laws jurisprudence—at a time when that jurisprudence is in an advanced stage of thaw.[11] A majority of this Court rejects this rationale for the same reasons which prompted this writer to reject it in his dissenting opinion.

It is suggested, however, that a different constitutional analysis supports the result reached by the panel. The proponents of this analysis are willing to assume that New York's "contacts" with the transaction are sufficient to support an application of New York's entire wrongful death statute to this accident although it occurred outside the territory of New York. In adopting this approach they would concede that the facts of this case—i. e., (a) Mr. Pearson's purchase of his airplane ticket at a New York office of a foreign corporation doing a large part of its business in New York; (b) his attempt to travel from New York, where he was domiciled, on a regularly scheduled flight most of which was conducted over New York; and (c) the New York domicile of his wife, administratrix and beneficiary under the Wrongful Death Act—are so closely related to the State of New York that it would have the constitutional power to apply its own wrongful death law to this litigation. However, the proponents of this constitutional analysis would deem it contrary to the mandate of the Full Faith and Credit Clause if New York were to entertain a claim for wrongful death "under" the Massachusetts act but apply New York principles governing the exent of permitted recovery. In summary, they urge that once a New York court recognizes a claim for wrongful death based on Massachusetts law, that law must control every incident of the claim. They argue that New York is not required to give *any* faith or credit to the Massachusetts act, but once it gives Massachusetts law *some* faith and credit it must also give it *full* faith and credit.

We find this construction of the constitutional mandate untenable. Despite the resourceful arguments put forth in its behalf, we are not persuaded that a statutory limitation upon the amount of money that may be recovered should merit any greater obeisance than statutory limitations addressed to the length of time during which the action may be brought, or to the parties who are empowered to bring that suit, or to the survival or abatement of the cause of action upon the death of the injured party. In

---

9. See note 13 of this writer's dissent from the panel opinion. 307 F.2d at 141.

10. See 307 F.2d at 139–140.

11. See, e. g., Hausman v. Buckley, 299 F. 2d 696 (2d Cir., 1962); Zogg v. Penn Mutual Life Ins. Co., 276 F.2d 861 (2d Cir., 1960).

each instance the statute qualifies the rights and obligations to which the statutory cause of action gives birth.

■ We are directed to no precedent, and are unaware of any compelling logic independent of precedent, which requires a state to enforce such statutory qualifications whenever it chooses to recognize a foreign-based cause of action.[12] For example, the cases are numerous in which a forum state applies its own statute of limitations despite the fact that a limitations period of different duration is expressly incorporated in the statute of the foreign jurisdiction creating a cause of action. See, e. g., Bournias v. Atlantic Maritime Co., 220 F.2d 152 (2d Cir., 1955). This is usually accomplished by referring to the statute of limitations as involving mere "procedure" and not "substance". The niceties of such legal legerdemain do not concern us; it is the result that speaks loudly. The Supreme Court has specifically held that a state does not violate the Full Faith and Credit Clause in applying its statute of limitations so as to bar a cause of action still viable in the *locus delicti*. See Wells v. Simonds Abrasive Co., 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953). The Wells case tells us that this is true even though the forum state is refusing to apply a statute of limitations "built into" a statutory cause of action for wrongful death as an "integral" or "substantive" provision.

■ Despite the effort in Wells to pierce to the core of the constitutional issue rather than be occupied by mere labels, we are told that the case is not controlling in the litigation before us, because statutes of limitations involve merely matters of "procedure", of judicial house-keeping. We are further told in buttress of this proposition that it is sheer verbiage to say that the difference between a right limited to $15,000 and one that may run to $160,000 is mere "procedure". But the verbiage is equally thin that would explain any constitu-

12. Most of the cases urged on behalf of the principle that the maximum-liability provision is an inseparable part of the right and therefore must be enforced by the forum are relics of the vested-rights theory, sufficiently discussed by this writer in 307 F.2d at 140–42. See, e. g., Davis v. Mills, 194 U.S. 451, 24 S.Ct. 692, 48 L.Ed. 1067 (1904); Slater v. Mexican National R. R. Co., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904); Northern Pac. R. R. Co. v. Babcock, 154 U.S. 190, 14 S.Ct. 978, 38 L.Ed. 958 (1894). It should further be noted that the Court in these cases analyzed the problem in terms of a proper independent choice-of-law by the federal courts, before the advent of Erie v. Tompkins; they therefore hardly determine the question whether a state has *constitutional power* to analyze conflict of laws questions in terms of separate issues.

One of the cases urged most forcefully in support of the constitutional analysis under discussion is Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947). It was there held that a South Dakota court enforcing rights created by the constitution of a fraternal benefit association incorporated under Ohio law had to apply Ohio law regarding the statute of limitations. But the Supreme Court did not, in that case, say that South Dakota could have *completely* ignored Ohio law and applied its own and that once having applied Ohio law on contract rights it also had to apply Ohio law regarding the statute of limitations. What the Court did do there was actually to compare and balance the interests and contacts of South Dakota and Ohio; it held that the interests of the former were not as significant as those of the latter and that, under the Full Faith and Credit Clause, Ohio law had to be fully applied. To that extent, we consider Wolfe to have been superseded by Richards v. United States, 369 U.S. 1, at 15, 82 S.Ct. 585, at 594, 7 L.Ed.2d 492: "Where more than one state has sufficiently substantial contact with the activity in question, the forum state, by analysis of the interests possessed by the states involved, could constitutionally apply to the decision of the case the law of one or another state having such an interest in the multistate activity."

At any rate, Wolfe dealt with an admittedly unique situation, the relationship between members of a fraternal benefit society. The Court's own language leads us to believe that Wolfe would not be controlling in this case. See 331 U.S. at 605–606, and at 641–642, 67 S.Ct. 1374 (dissenting opinion).

tional distinction between time limitations and dollar limitations as one between "procedure" and "substance". It is true that one of the purposes of the statute of limitations is to relieve a court system from dealing with "stale" claims where the facts in dispute occurred long enough ago that evidence is either forgotten or manufactured. But the wide variety of statutory periods cannot be explained solely on the basis of stale evidence. There is no doubt another element, of a more "substantive" character, which might be described as a concern for the interests of the potential defendant.[13]

We do not rest, however, on cases upholding the constitutional power of the forum to disregard the statute of limitations of the *locus delicti*. The Supreme Court has, within the past year, cited with approval two cases emanating from the highest courts of two of our states which applied a rule of local law to govern an incident of a cause of action based upon the law of a foreign state. See Richards v. United States, 369 U.S. 1, 12 n. 26, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In Grant v. McAuliffe, 41 Cal.2d 859, 264 P.2d 944, 42 A.L.R.2d 1162 (1953), Judge Traynor, speaking for the California Supreme Court, held that although the cause of action for personal injuries was based upon Arizona law, the matter of its survival or abatement was sufficiently of local concern to be governed by the law of the forum. In Haumschild v. Continental Casualty Co., 7 Wis.2d 130, 95 N.W.2d 814 (1959), the second case cited with approval by the Supreme Court, the law of the forum and of the parties' domicile as to interspousal immunity was applied to a tort committed outside the state. Surely these cases cannot be dismissed with an invocation of the substance-procedure dichotomy.

Our decision cannot, therefore, be interpreted to condone a forum's applying its own rules in a wanton manner by labeling matters "procedural" while arbitrarily choosing the parts of a foreign statute it wishes to enforce by labeling them "substantive".[14] We do hold, however, that a state with substantial ties to a transaction in dispute has a legitimate constitutional interest in the application of its own rules of law. If, indeed, those connections are wholly lacking or at best tenuous, then it may be proper to conclude that the state has exceeded its constitutional power in applying its local law. See, e. g., Home Insurance Co. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930); Currie, "The Constitution and the Choice of Law: Governmental Interests and the Judicial Function," 26 U.Chi.L.Rev. 9, 75 (1958). But that is, *ex hypothesi*, not the case before us.

13. There can be no doubt that statutes of limitations embody a concern for the speedy disposition of claims within a reasonable period after their origin, for the protection of the defendant from protracted fear of litigation. This seems to be the very reason that the period of limitations in wrongful death cases is usually shorter than that of the ordinary action of negligent torts. The fact that statutes of limitations in wrongful death actions are usually denominated "substantive", see Restatement, Conflict of Laws § 397, clearly reveals that the policies they embody are not merely those of judicial housekeeping. Compare N.Y. Dec.Est.Law, McKinney's Consol.Laws c. 13, § 130 (two-year period of limitations for wrongful death action) with N.Y.Civ. Prac. Act § 49 (three-year period for negligent injury to property or person).

That "stale evidence" is not the only reason for statutes of limitations is corroborated by the fact that the very same complex of facts may give rise to both a cause of action in contract or quasi-contract and a cause of action in tort; it is almost universally true that the statute of limitations on each such cause of action will differ in length. See Restatement, Torts § 899, Comment b.

14. Much of the language in Kilberg classifying the maximum-liability provision as procedural might have appeared to some to be just such a subterfuge. But this language has since been disregarded by the New York Court of Appeals and Kilberg interpreted as an affirmation of a strong state public policy. See Davenport v. Webb, 11 N.Y.2d 392, 230 N.Y.S. 2d 17, 183 N.E.2d 902 (1962).

The argument advanced, that once New York gives *some* faith and credit to the Massachusetts statute it must give it *full* faith and credit—that is, each incident of the cause of action must be enforced precisely as defined by the statute creating it—is not new. Indeed, it has been attacked as unsound by one of our leading scholars in the field of conflict of laws. Professor Currie has described it as a natural argument for someone "schooled in the assumption that the law of one and only one state must govern the whole of any transaction * *." "The Constitution and the Choice of Law: Governmental Interests and the Judicial Function", 26 U.Chi.L.Rev. 9, 63 (1958). That underlying assumption is inconsistent with the views expressed by the Supreme Court as long ago as 1934, when Alaska Packers Ass'n v. Industrial Accident Commission, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044, was decided. In that case the Court expressly recognized that rights asserted under the statute of one state may necessarily be denied or qualified by the law of another.

"The necessity [to decide the extent 'to which the statute of one state may qualify or deny rights asserted under the statute of another'] is not any the less whether the statute and policy of the forum is set up as a defense to a suit brought under the foreign statute or the foreign statute is set up as a defense to a suit or proceedings under the local statute. In either case, the conflict is the same. In each, rights claimed under one statute prevail only by denying effect to the other. In both the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause, compelling the courts of each state to subordinate its own statutes to those of the other, but by appraising the governmental interests of each jurisdiction, and turning the scale of decision according to their weight." 294 U.S. at 547, 55 S.Ct. at 524.

▇ The decision we reach seems to be in keeping with a view of the Constitution as a primer of fundamental principles for the conduct of a developing federal system rather than a manual of technical rules. The Supreme Court was mindful of this when it recently pronounced

"As a consequence of the modern practice of conducting widespread business activities throughout the entire United States, this Court has in a series of cases held that more states than one may seize hold of local activities which are part of multistate transactions and may regulate to protect interests of its own people, even though other phases of the same transactions might justify regulatory legislation in other states." Watson v. Employers Liability Assurance Corp., 348 U.S. 66, 72, 75 S.Ct. 166, 169, 99 L.Ed. 74 (1954).

We construe this as recognizing that a single "transaction" may contain within itself several distinct "issues" legitimately made subject to the law of more than one state.

▇ True, New York reiterated its partial adherence to the rule of *lex loci delictus*. But does this require that New York be deprived of any power to apply a fundamental rule of public policy to one incident of the cause of action? New York has done nothing more than to apply a traditional choice-of-law rule which designates the law of Massachusetts as the source of liability for a wrongful death. It has absorbed the Massachusetts rule into the corpus of New York law for purposes of adjudicating this case fairly. See Siegmann v. Meyer, 100 F.2d 367 (2d Cir., 1938); Guinness v. Miller, 291 F. 769 (S.D.N.Y.1923) (L. Hand, J.), aff'd, 299 F. 538 (2d Cir., 1924), aff'd *sub nom.* Hicks v. Guinness, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925); Cavers, "The Two 'Local Law' Theories," 63 Harv.L.Rev. 822 (1950); Cook, "The Logical and Legal Bases of the Conflict of Laws," 33 Yale L.J. 457 (1924). We believe that in doing so New York is not bound to model *all* of the rules governing this litigation in which

it is conceded it has a legitimate interest, on Massachusetts law. We are convinced that New York may examine each issue in the litigation—the conduct which creates liability, the parties who may bring an action, the extent of liability, the period during which the liability may be sued upon, and in appropriate cases, matters of immunity, insurance procedure, etc.— and by weighing the contacts of various states with the transaction, New York may, without interfering with the Constitution, shape its rules controlling the litigation.

■ It is argued in the dissenting opinion that the decision we reach today will result in an unwarranted invasion by New York of Massachusetts' freedom of action, and that henceforth no state can legislate without incurring the risk that the courts of a sister state, having some contact with the transaction, will use its law to reach a result never intended by the legislators. We find these arguments unconvincing because they rest on a premise with a very dubious constitutional underpinning. We may concede that the Wrongful Death Statute of Massachusetts, almost certainly designed with an eye toward the regulation of occurrences transpiring wholly within Massachusetts, should be honored fully and completely when the incident under litigation is a local one. Such, we take it, is the import of Home Insurance Co. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). But we cannot concede that Massachusetts has a constitutionally protected claim to the unqualified application of its statute in cases with an over-

whelmingly interstate flavor.[15] The adoption of such a principle would effect an incursion by Massachusetts upon the public policy of New York far more serious than the purported incursion upon Massachusetts policy which we have upheld today. If Massachusetts local rules must, by constitutional compulsion, govern every aspect of a transaction so intimately affecting the interests of New York, then the concept of full faith and credit is being utilized as an extraordinary example of oppressiveness to legitimate and lawful state interests.

■ The constitutional assault upon the Kilberg principle has not been limited to the Full Faith and Credit Clause, however. We are likewise told that it violates the Due Process Clause of the Fourteenth Amendment.[16] In order that the latter clause be violated there must be some deprivation of life, liberty or property. It is argued that our decision deprives the defendant of property. But to assert that Northeast Airlines is being deprived of its "property" is to assume the very point in issue, i. e., that Northeast is given some vested property right by the application of the Massachusetts rule of liability for wrongful death. This writer has already stated in his panel dissent that no such vested right exists. See 307 F.2d 140–142.

This "deprivation of property" argument may also explain a purported distinction urged upon us, which is drawn between the case before us and some of the earlier Supreme Court cases, such as Wells v. Simonds Abrasive Co., 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953).

15. In the converse situation, Massachusetts courts have long utilized the public policy argument as a means of guarding Massachusetts interests in multistate transactions. See 307 F.2d at 139, n. 8. The interstate flavor of modern air transportation is well described in the Kilberg case, 9 N.Y.2d at 39, 211 N.Y.S.2d at 135, 172 N.E.2d at p. 527: "Modern conditions make it unjust and anomalous to subject the traveling citizen of this State to the varying laws of other States through and over which they [sic] move. * * * An air

traveler from New York may in a flight of a few hours' duration pass through several * * * commonwealths. His plane may meet with disaster in a State he never intended to cross but into which the plane has flown because of bad weather or other unexpected developments, or an airplane's catastrophic descent may begin in one State and end in another. The place of injury becomes entirely fortuitous."

16. " * * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *."

This distinction was expressed in the majority panel opinion in this case in this fashion:

> "In Wells the plaintiff was not deprived of all remedy; he could sue in any state where defendant could be found and which has a longer statute of limitations than Pennsylvania [the forum] or follows a different conflicts rule. In our case defendant had no choice as to the forum. If deprived of the protection of the limitation imposed by the law which, as Kilberg recognizes, created the liability, he will be treated unjustly." 307 F.2d at 135.

In short, it is argued that Wells merely closed off to the plaintiff the courts of one state, whereas Kilberg fastened upon the defendant an irrevocable liability. This theory, which draws a constitutional distinction between temporary inconvenience to the plaintiff and irremediable prejudice to the defendant, falters in at least one serious respect. It assumes that the plaintiff will be free to step across state lines, serve the defendant, and start his suit all over again. This assumption is immediately prone to attack. The dismissal of the plaintiff's action may be an effective adjudication where there is no other forum in which suit may be brought.[17]

Furthermore, once conceded that the defendant is given no vested property right merely because his interstate activities result in tortious conduct in a state whose law happens to be favorable to him, then the distinction between the result in Wells and the result in Kilberg falls of its own weight. We must emphasize that we are not concerned here with the *wisdom* of New York's choice-of-law, but only with its *power* to choose as it did in Kilberg. The Supreme Court in Wells upheld the *power* of the forum

to subordinate or replace "substantive" or "integral" parts of a foreign statute so as to relieve a defendant from liability enforceable under the foreign statute. But is the forum to be deprived of the constitutional power to deal with a statute in exactly the same manner when the only difference will be a favorable result to the plaintiff instead of the defendant? The Supreme Court has in fact held that a state may choose to ignore or to qualify *defenses* that arise under the laws of another state. Watson v. Employers Liability Assurance Corp., 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954), held that the concern of Louisiana for the protection of its residents was sufficient to empower it to hear in its courts a direct action against a nonresident insurance company, despite a no-action clause in a Massachusetts contract allegedly controlling the obligations of the insurer.

We therefore see no escape from the proposition we announce today, that a legitimately interested state may, under the circumstances of this case, apply a firmly fixed and long existing policy of its own, although this would remove a defense provided by an "integral" provision of the locus' statute creating the cause of action. This Court, in Bournias v. Atlantic Maritime Co., supra, in an opinion by then Circuit Judge Harlan, held that a District Court sitting in New York could refuse to apply the one-year Panamanian statute of limitations incorporated in the very statute creating the cause of action upon which the suit was brought. There, as here, part of a foreign statute was rejected so as to eliminate a *defense* to the suit and to enhance the liability; in Bournias, it was length of time, in this case it is dollar limit. Both adversely affected the defendant.[18] Just such a result was forecast in Jus-

---

17. Further, a dismissal on public-policy grounds treads the thin line between a judgment on the merits and a judgment without prejudice; should a second jurisdiction view it as a judgment on the merits, the plaintiff will be "irremediably prejudiced" there. This lends support to

our contention, to be developed shortly, that the fact that an application of the forum's public policy favors one party rather than the other is constitutionally irrelevant.

18. An attempt might be made to distinguish Bournias on the Court's finding that

tice Brandeis' dictum in Home Insurance Co. v. Dick, 281 U.S. 397, 409, 50 S.Ct. 338, 342, 74 L.Ed. 926 (1930): "It is true that a State may extend the time within which suit may be brought in its own courts * * *. And * * * the local statute of limitation may be applied to a right created in another jurisdiction even where the remedy in the latter is barred." It should be unquestioned at this late date that the law of the forum may under certain circumstances very seriously qualify or expand the rights or obligations created by the statute of a foreign state. Whether this works to the benefit of one party or the other is clearly irrelevant to the issue of full faith and credit; and we can find no reason for holding that it has any greater relevancy to the issue of due process.

 A violation of the Due Process Clause of the Fourteenth Amendment requires not only that there be a deprivation of property—and we have found none here—but also some unreasonable or unreasoned imposition of liability. In the area of conflict of laws, the Due Process Clause prevents an arbitrary application of a state's jurisprudence to an out-of-state event. It is not disputed that New York would not be arbitrary if it selected its own law to apply to the *whole* of this controversy. How, then, can the selection become arbitrary and constitutionally prohibited when New York makes an even more intelligent and rational application of its own law to a particular *issue* in the litigation?[19] Could there be any principle of conflict of laws more arbitrary than the one advanced on behalf of the defendant, that New York need not apply Massachusetts law at all but that once New York models its rule of liability on the Massachusetts law it abdicates all power to make a wise choice of law to govern the other incidents of the litigation? Just as we stated when dealing with the Full Faith and Credit Clause, the Due Process Clause if so construed would be destructive of legitimate and lawful state interests and lose meaning. There is no precedent which supports such a constitutional proposition and we are disinclined to stamp our approval on such dubious doctrine.

The field of conflict of laws, the most underdeveloped in our jurisprudence from a practical standpoint, is just now breaking loose from the ritualistic thinking of the last century. Recent opinions of the Supreme Court and the great wave of academic writing reinforce this trend toward flexible and articulate selection of the laws governing multistate transactions.[20] The development will be stillborn if we impose inflexible constitutional strictures in the name of national unity, restrictions which could not be repaired by state or federal legislation.[21]

 Finally, we hold, for the reasons stated in this writer's original dissenting opinion, that Judge McGohey was right

the statutory period was not "specifically" built in so as to refer unmistakably to the cause of action in question. But in Wells, the Supreme Court said: "Differences based upon whether the foreign right was known to the common law or upon the arrangement of the code of the foreign state are too unsubstantial to form the basis for constitutional distinctions under the Full Faith and Credit Clause." 345 U.S. at 518, 73 S.Ct. at 858.

19. For a lucid discussion of the need for deciding conflict of laws problems on the basis of the particular issues in dispute, see Cavers, "Re-Restating the Conflict of Laws: The Chapter on Contracts,"

Twentieth Century Comparative and Conflicts Law, 349, 357–58 (1961).

20. See Richards v. United States, 369 U.S. 1, 12–13, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

21. See Freund, "Chief Justice Stone & the Conflict of Laws," 59 Harv.L.Rev. 1210, 1235–36 (1946): "If the task of Conflict of Laws is to understand, harmonize, and weigh competing interests in multistate events, and if the desideratum of uniformity will be approached most satisfactorily by evolving rules that deliberately seek these objectives, then we seem to be hardly ready for a set of precepts imposed in the process of Supreme Court decision as fixed canons of constitutional law."

in instructing the jury that the measure of damages should be based not upon the degree of the defendant's culpability but upon the extent of pecuniary loss sustained by the dependents.[22] Moreover, as decided unanimously by the original panel, and for the reasons stated there, the running of interest on the judgment should be determined by Massachusetts law.

The judgment below is affirmed, as reduced by the modification of the award for interest.

FRIENDLY, Circuit Judge, with whom LUMBARD, Chief Judge, and MOORE, Circuit Judge, join (dissenting).

I find nothing in the Federal Constitution that would prevent the legislature of New York from amending its wrongful death act, Decedent Estate Law, § 130 et seq., to include the death in a sister state of a New York resident travelling on a flight from New York on a ticket purchased in New York, or the courts of New York from now reading its wrongful death act to cover such a case. Whether any one of these "contacts" would alone warrant New York in thus applying its own wrongful death act and refusing any "faith and credit" to the "public acts" of the sister state, certainly the combination does. So far as concerns the issue here, Alaska Packers Ass'n v. Industrial Accident Commission, 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935), and Richards v. United States, 369 U.S. 1, 15, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), indicate that but no more than that. I would agree also that New York is constitutionally free to overrule decisions that forbid or restrict the personal representatives of a party to a contract of carriage made in New York from suing, on the contract, for wrongful death wherever it may occur. Our brothers' fears as to the imposition of inflexible constitutional strictures on the development of choice of law rules are thus quite needless; the majority seems rather to be supporting itself with ghosts of its own conjuring.

It is common ground that New York has not followed any of the courses just outlined. All seven of the judges of the Court of Appeals in Kilberg repudiated an action ex contractu. The majority likewise disclaimed any idea that recovery might be had, in tort, under New York's wrongful death act. Chief Judge Desmond said, 9 N.Y.2d 34, 40, 211 N.Y. S.2d 133, 135–136, 172 N.E.2d 526, 528 (1961), with entire clarity: "We will still require plaintiff to sue on the Massachusetts statute but we refuse on public policy grounds to enforce one of its provisions as to damages"—"We * * * refuse to apply that part of the Massachusetts law". Moreover, in a subsequent case involving a claim for wrongful death in a sister state, the Court of Appeals underlined what it had said in Kilberg. After stating "We there indicated that the courts of this State were free to award damages in excess of the amount limited by a foreign death statute under which the action was brought * * *", it applied a rule of the sister state disallowing pre-judgment interest despite the contrary direction of § 132 of the New York Decedent Estate Law. Davenport v. Webb, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 19, 183 N.E.2d 902, 904 (1962). New York under the Kilberg doctrine thus gives some faith and credit to the foreign wrongful death act. In Kilberg it enforced the Massachusetts statute, Ann.Laws Mass., c. 229, § 2, (as in effect in 1958) insofar as this decrees that "If the proprietor of a common carrier of passengers * * * by reason of his or its negligence or wilful, wanton or reckless act, or by reason of the unfitness or gross negligence or carelessness, or the wilful, wanton or reckless act, of his or its servants or agents, causes the death of a passenger, he or it shall be liable in damages * * *." But New York disregards the words immediately following: "in the sum of not less than two thousand nor more than

22. See 307 F.2d at 146–147.

fifteen thousand dollars, to be assessed with reference to the degree of culpability of the defendant or of his or its servants or agents, and recovered and distributed as provided in section one, and to the use of the persons and in the proportions, therein specified." Although Kilberg did not provide the detail as to just what New York would supply in place of the excised language save only that there would be no limitation on the amount of recovery, our brothers fill the gap; they decide that in New York the amount of recovery under the Massachusetts Act is to be measured by the loss sustained by the dependents without regard to the degree of defendant's culpability. Appellant contends that the Full Faith and Credit Clause, Art. IV, § 1, and the Due Process Clause of the 14th Amendment forbid this.

A superficially attractive answer is that if New York could validly arrive at the Kilberg result on a theory of contract or through amendment or construction of its own wrongful death act, the Constitution does not demand a different conclusion because New York attains the same goal through excising or altering a provision of the Massachusetts Act. I say "superficially attractive" since the two processes differ not only conceptually— which may not be altogether unimportant in a legal system designed to maintain a certain degree of order among fifty states —but practically as well. Although the primary interest of the framers of the Constitution in the area of intergovernmental relations was doubtless to set boundaries between the new Federal Government and the states, they were concerned also with preventing encroachments by one state upon another. See Ogden v. Saunders, 12 Wheat. 213, 369, 6 L.Ed. 606 (1827). Madison characterized the Full Faith and Credit Clause as among those "which provide for the harmony and proper intercourse among the States." The Federalist No. 42. Granted that whenever a New York court enters a judgment, it is enforcing New York "law", and that New York may

often make the same rules that govern transactions within New York apply to events in a sister state, it does not follow that when New York looks to a statute of a sister state as the source of a claim enforceable in its courts, the Constitution allows it to decline, in the Supreme Court's words, "to give full faith and credit to all those substantial provisions of the statute which inhered in the cause of action or which name conditions on which the right to sue depend[s]." Tennessee Coal, Iron & R. R. Co. v. George, 233 U.S. 354, 360, 34 S.Ct. 587, 588, 58 L.Ed. 997 (1914); see Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 625, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947).

An important reason why a forum state may not do this is that it thereby interferes with the proper freedom of action of the legislature of the sister state. The terms and conditions of a claim created by statute inevitably reflect the legislature's balancing of those considerations that favor and of those that oppose the imposition of liability. The legislature may be quite unwilling to create the claim on terms allowing it to be enforced without limit of amount as most common law rights can be, or for a period bounded only by statutes of limitations ordinarily applicable. The Full Faith and Credit Clause insures that, in making its choice, the legislature creating the claim need not have to weigh the risk that the courts of sister states looking to its "public acts" as a source of rights will disregard substantial conditions which it has imposed—a calculation that would involve variables so numerous and unpredictable as to preclude any intelligent choice. This consideration is inapplicable to instances where the forum, looking solely to its own substantive law, wholly disregards that of the sister state, as the Supreme Court held permissible in Alaska Packers; there nothing turns on whether or not the lawmakers of the sister state have acted or how they have acted. True, conduct in the enacting state has been given consequences differ-

ent from what the legislators of that state desired; but that is the inevitable result of the duplicate law-making jurisdiction that can never be wholly avoided even in our federal system—not of action taken by the legislators of the enacting state in the absence of which the forum would not impose liability at all. The increasing scope of statutory liabilities makes it particularly vital that lawmakers of one state should know that once a transitory right has been created by them, it will receive the uniform enforcement from other states which the Full Faith and Credit Clause contemplated, see Hughes v. Fetter, 341 U.S. 609, 612, 71 S.Ct. 980, 95 L.Ed. 1212 (1951), compare Id. fn. 10, and that they should not be obliged to speculate that other states may take what is liked and reject what is disliked—a prospect that might well discourage or prevent enactments otherwise deemed desirable.

The situation is not altered by the circumstance that we are here dealing with a wrongful death act. If the forum state may disregard limitations on recovery in one type of foreign statute to which it looks as a source of rights, at least when it has as many "contacts" as New York had here, I can see no basis in principle why it may not do so in every other, and the majority appears to hold that view. Indeed, the instant case is a peculiarly weak one for reliance on any special rule relating to wrongful death acts. The Massachusetts statute departs from the norm in its penal character. "[T]he Massachusetts acts are exactly what Lord Campbell's act is not." Hudson v. Lynn & Boston R. R. Co., 185 Mass. 510, 519, 71 N.E. 66, 70 (1904). "Their basic theory as to damages is punishment not compensation." Porter v. Sorell, 280 Mass. 457, 462, 182 N.E. 837,

839, 85 A.L.R. 1159 (1932). "The standard of liability under the Massachusetts Death Act is punitive—i. e., 'with reference to the degree' of culpability—not compensatory." Massachusetts Bonding & Ins. Co. v. United States, 352 U.S. 128, 132, 77 S.Ct. 186, 188, 1 L.Ed.2d 189 (1956). Recovery is limited, to be sure, but there is a minimum also, which may be recovered without proof of pecuniary loss, Beatty v. Fox, 328 Mass. 216, 102 N.E.2d 781 (1952), and, if the defendant be sufficiently culpable, the award may outrun the damages sustained, as, for example, in the death of an aged person or an infant. Whether Kilberg means that New York will enforce those provisions of the Massachusetts Act providing a larger recovery than New York would ordinarily allow or that New York will substitute a wholly new standard of liability and damages, as the district judge here thought, 199 F.Supp. 539, 540 (S.D. N.Y.1961), a view which the majority adopts without explanation other than that in the original dissenting opinion,[1] the result is for New York to give the Massachusetts statute an application altogether different from what the framers of the latter intended. To allow that is, indeed, a strange way to "provide for the harmony and proper intercourse among the States" which the Full Faith and Credit Clause was intended to promote.

The Kilberg opinion justifies all this, and our brothers approve, on the basis that "It is open to us, therefore, particularly in view of our own strong public policy as to death action damages, to treat the measure of damages in this case as being a procedural or remedial question controlled by our own State policies." 9 N.Y.2d at 41–42, 211 N.Y.S.2d at 137, 172 N.E.2d at 529. It is true that

1. This was that "the standard of culpability, by its total disregard for the injury actually sustained by the decedent's dependents, violates the primary purpose of most wrongful death legislation, including that of New York, which is concern for the pecuniary loss of the beneficiaries who remained behind," 307 F.2d at 147. The primary purpose of the New York legislation, certainly, and of "most" wrongful death acts, probably, see 2 Harper & James, The Law of Torts, § 24.2 at 1288 (1956), but clearly not of the Massachusetts Act to which New York here looks as the source of plaintiff's claim.

the Full Faith and Credit Clause does not demand that, in enforcing a right given by statute of a sister state, the forum must abandon its own procedural rules. Thus the forum may and ordinarily will apply its own rules as to such matters as discovery, evidence and mode of trial; it would be free to give a jury trial although the foreign statute provided for trial to a judge, or vice versa, just as it may disregard venue limitations in the statute giving rise to the claim, Tennessee Coal, Iron & R. R. Co. v. George, supra. When the foreign state has not made a period of limitations a qualification on the right, the forum may apply its own longer statute, Bournias v. Atlantic Maritime Co., 220 F.2d 152, 154–158 (2 Cir., 1955). Likewise the forum may enforce a statute of limitations shorter than what the enacting state has "built in" to the right; no state can require another to keep its courts open for the enforcement of a claim given by the former's law which the latter would not enforce if created solely by its own. Wells v. Simonds Abrasive Co., 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953). However, merely labeling a difference from the foreign law as "procedural" or "remedial" rather than substantive will not defeat application of the Full Faith and Credit Clause, as John Hancock Mutual Life Ins. Co. v. Yates, 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106 (1936), clearly holds. Cf. Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 497–498, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Although, as the Court of Appeals indicated in Kilberg, there are cases where the issue "whether a given question is one of substance or procedure" may be doubtful, 9 N.Y.2d at 41, 211 N.Y.S.2d at 137, 172 N.E.2d at 529, this is not one. That Massachusetts regards the limit as an essential part of the cause of action created by its legislature is clear beyond peradventure. Not only does the statute tie the words together as closely as possible, but the unique nature of the claim, with $2,000 payable regardless of the damages and with awards above that varying with the degree of culpability, makes it plain that the ceiling is as integral a part of the right as the floor. There is, moreover, other persuasive evidence of Massachusetts' legislative intent. Effective in 1959, the Massachusetts General Court rewrote the statute completely but declined to abolish either the "degree of culpability" standard or the limitation on the amount recoverable; instead it simply increased the maximum from $15,000 to $20,000. Ann.Laws Mass. c. 229, § 2 (Cum.Supp.1961), Mass.Acts 1958, c. 238, § 1. Just this year the statute was again amended, effective Jan. 1, 1963, with the only change being the raising of the minimum recovery to $3,000 and the maximum to $30,000. Mass.Acts 1962, c. 306.[3] Common sense tells us that "The size of a right is a part of

---

2. No case holds that the forum may constitutionally extend the period "where a statute creates a new liability and in the same section or in the same act limits the time within which it can be enforced," Davis v. Mills, 194 U.S. 451, 454, 24 S.Ct. 692, 694, 48 L.Ed. 1067 (1904). In addition to the Davis case, The Harrisburg, 119 U.S. 199, 214, 7 S.Ct. 140, 30 L.Ed. 358 (1886), and Bournias v. Atlantic Maritime Co., supra, indicate it may not do this when it is clear that the state creating the right meant the time limitation to be a condition on it and thus applicable generally.

3. In making this change the legislature had before it, and explicitly disapproved, bills which would have removed the recovery ceiling altogether. See Legislative Record at 583, in Commonwealth of Massachusetts, General Court of 1962, Bulletin of Committee Work and Business of the Legislature (Final Ed., 1962 Sess.) (committee states that its recommendation of H. No. 3476, the bill which passed, was based on consideration of three bills, two of which, H. No. 274 and H. No. 2964, would have abolished ceiling); Mass.Judicial Council, 37th Report 45–47 (1961) ("accepted" June 21, 1962) (adverse report on bill to eliminate ceiling).

the right," Leflar, Conflict of Laws (1959), § 65, at 118. A layman would, indeed, be astonished that anyone could characterize as "merely procedural" a rule of law which may increase a recovery from $15,000 to $160,000 or well beyond that, even though he could appreciate that a rule wholly defeating recovery because of untimeliness in bringing the action was. Until now the law in this area has not departed so far from the common understanding of men. The Supreme Court has said that "the question of the proper measure of damages is inseparably connected with the right of action * * *," Chesapeake & Ohio Ry. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916), and this rule applies specifically with reference to claims for wrongful death. See Northern Pac. R. R. v. Babcock, 154 U.S. 190, 197–198, 14 S.Ct. 978, 38 L.Ed. 958 (1894); Slater v. Mexican National Ry. Co., 194 U.S. 120, 24 S.Ct. 591, 48 L.Ed. 900 (1904); Goodrich, Conflict of Laws (3 ed. 1949), § 105; 15 A.L.R.2d 762, 765 (1951). A limit on the amount of recovery on a statutory right bears no resemblance to those "limitations * * * imposed to promote practicality, convenience, and the integrity of local practice", which, as this Court has said, are properly denominated "procedure". Collins v. American Automobile Ins. Co., 230 F.2d 416, 421–422 (2 Cir., 1956).

I find little force in a contention that the distinction between substance and procedure should not be given constitutional significance in the application of the Full Faith and Credit Clause. On the contrary, as was so clearly pointed out by Mr. Justice Brandeis in the John Hancock case, supra, blind acceptance of the characterizations made by state courts would be the surest way to undermine this constitutional guarantee. If the label affixed by the forum state were conclusive, New York could equally override the Massachusetts limit on recovery when it did not have the contacts that it had in Kilberg or here. In this field of law also, there may be a "twilight zone", see Sampson v. Channell, 110 F.2d 754, 756–757 (1 Cir.), cert. denied, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415 (1940); D'Onofrio Construction Co. v. Recon Co., 255 F.2d 904, 910 (1 Cir., 1958); Iovino v. Waterson, 274 F.2d 41, 48 (2 Cir., 1959), cert. denied, 362 U.S. 949, 80 S.Ct. 860, 4 L.Ed.2d 867 (1960), where a determination by the forum state that a matter is procedural will be respected even though another court in its independent judgment would regard the issue as substantive. The survival of a claim against a deceased resident defendant, Grant v. McAuliffe, 41 Cal.2d 859, 264 P.2d 944 (1953), cited by the majority, may lie in this zone.[4] But the transformation of a penal and limited statutory liability into a compensatory and unlimited one goes far beyond the widest concept of "procedure" or "remedy". No one would suppose that Congress, simply by classifying its edict as "procedural", could constitutionally direct the Federal courts, in diversity ac-

4. Haumschild v. Continental Casualty Co., 7 Wis.2d 130, 95 N.W.2d 814 (1959), also cited in the majority opinion, held that the forum would apply the law of the spouses' domicile, which allowed the action, rather than that of the place of accident, to determine whether one spouse had the right to sue another for tort; in view of the traditional recognition of the law of the domicile as governing marital relations, see Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218 (1956), this decision is hardly pertinent. It should also be observed that both Grant and Haumschild related to common law claims where there was no indication that the state of the accident had the slightest interest in the course followed by another forum when the defense of death or of inter-spouse immunity of the actor was asserted as to one of the latter's residents; here it is apparent that the interest of the Massachusetts legislature in limiting what could be collected from a common carrier for death in that state was not confined to Massachusetts suits. In the Grant case Judge Traynor expressly distinguished statutory causes of action for wrongful death, 41 Cal.2d 864–865, 264 P.2d 947–948.

tions, to disregard limitations on the amount of recovery in state wrongful death acts. If the mere label of "procedure" is thus inadequate to enlarge Federal power beyond constitutional limitations, it is likewise inadequate to enable a state to hurdle the Full Faith and Credit Clause. See also Levinson v. Deupree, 345 U.S. 648, 651–652, 73 S.Ct. 914, 97 L.Ed. 1319 (1953), and The Tungus v. Skovgaard, 358 U.S. 588, 592–593, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959), dealing with "procedure" and "substance" in the application of state wrongful death acts to maritime claims.

There remains only to consider the contention that what New York has done is supported by Watson v. Employers Liability Assurance Corp., 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954). That case held that Louisiana could validly subject a liability insurance company which had contracted, outside Louisiana, to pay amounts awarded in judgments or settlements resulting from injuries in Louisiana, to a direct action by the injured person despite a contractual stipulation against such an action in advance of the judgment or settlement. Louisiana was thus permitted to impose upon insurers of risks within its borders a new liability, created by it, wholly independent of the contractual duty to the insured, see Lumbermen's Mutual Casualty Co. v. Elbert, 348 U.S. 48, 51, 75 S.Ct. 151, 99 L.Ed. 59 (1954), and differing from the latter in many essential respects, see Collins v. American Automobile Ins. Co., supra, 230 F.2d at 419–422; Louisiana did not purport to be enforcing a "public act" of a foreign state and then altering it to suit its pleasure, as New York is doing here. The Watson decision might well be cited as sustaining the power of New York to make defendant's operations within its borders a basis for applying its own statute to deaths in the course of contracts made or flights commencing in New York; in no way does it uphold New York's invoking the Massachusetts Act as the source of the right and then transforming the right into one

altogether different in nature and amount from what Massachusetts has decreed.

We would reverse the judgment of the District Court, as was done in the decision of the panel written by Judge Swan.