**Kurt STRAUSS, Appellant,**

v.

**DOUGLAS AIRCRAFT CO., Appellee.**

**No. 192, Docket 32620.**

United States Court of Appeals
Second Circuit.

Argued Nov. 20, 1968.

Decided Dec. 12, 1968.

Stanley B. Gruber, New York City (Freedman, Borowsky & Lorry, Greenhill & Speyer, New York City, on the brief), for appellant.

Frederic L. Atwood, New York City (James J. Sentner, Jr., Haight, Gardner, Poor & Havens, New York City, on the brief), for appellee.

Before KAUFMAN and ANDERSON, Circuit Judges, and TENNEY, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

The dilemma to be resolved by us is how to strike a proper balance between the interest of Fed.R.Civ.P. 15(a) that leave to amend a pleading "shall be freely given when justice so requires," and the possible prejudice to other parties resulting from such amendment.

Kurt Strauss appeals from a final judgment in favor of Douglas Aircraft Co. [now known as McDonnell Douglas Corp. and hereinafter referred to as Douglas] after a trial before Judge Metzner and a jury in the Southern District of New York. He rests his claim, in part, upon a pre-trial order by Judge Tyler which belatedly allowed Douglas to amend its answer to Strauss' complaint in order to raise a defense based on California's Statute of Limitations. He also appeals from Judge Metzner's denial of his motion for a judgment notwithstanding the verdict and from various evidentiary rul-

* Of the Southern District of New York, sitting by designation.

ings. Strauss' action, over which we have diversity jurisdiction, asserted that because of its faulty seat belt assembly in the airplane, Douglas was responsible for damages by reason of negligence, breach of warranty, and strict liability in tort.

## I. THE FACTS

### A. *The Accident*

Strauss, a paper products manufacturer from Coatesville, Pa., was a frequent air traveller, primarily for business purposes. On May 12, 1960, he boarded a DC-8 jet aircraft, built by Douglas and owned by Delta Airlines Inc. [hereinafter Delta] for a flight from Chicago, Ill. to Miami, Fla. At the trial, Strauss testified that he fastened the belt upon being seated and left it fastened during the trip, as was his custom. Within a few moments after boarding he fell asleep and when he opened his eyes again, approximately a half hour before the plane landed in Miami, he saw a physician (a fellow passenger) bending over him and informing the stewardess that Strauss would require surgery. It seems that the plane had encountered severe air turbulence over Florida and a down draft had caused it to drop precipitously. Because of this, Strauss was hurled out of his seat and struck his head on the acoustical ceiling above his seat.

Strauss' claim is grounded on his contention that the injury was caused by a defect in the "passenger seat belt cable disconnect assembly" [hereinafter cable assembly], which is designed to attach the cloth webbing portion of the belt to the frame of the seat structure. He alleged that this cable assembly, manufactured by Douglas, was rended in the downdraft, thus bringing about the buffeting he received.[1]

The aircraft in question, was designed and manufactured by Douglas at its Long Beach, Calif. plant and delivered to Delta there (it was also sold in California) on November 4, 1959, approximately six months before the accident. At that time, the Douglas DC-8 was a relatively new plane; not one had logged more than 1860 hours of flight experience before the date of the accident. The faulted plane in this case had accumulated only 1362 flight hours and Strauss maintains that this was the first seat belt failure to occur in any DC-8.[2]

### B. *The Litigation*

The peripatetic history of this litigation illustrates the difficulties Strauss has encountered in having the merits of his claim against Douglas heard by a court. Strauss first commenced an action on Dec. 7, 1961 in the Eastern District of Pennsylvania [EDPA] against both Douglas and Delta. On Douglas' motion, it secured a dismissal from this suit on the ground that it was not amenable to service of process within that jurisdiction. While Douglas' motion was pending, Strauss filed suit against Douglas and Delta in Delaware since Douglas was a Delaware corporation. This action fell too because it was time-barred as against Douglas under the applicable one year Delaware Statute of Limitations. The claim against Delta was eventually withdrawn.

Accordingly, Strauss commenced the instant action solely against Douglas on April 6, 1962 in the Southern District of New York [SDNY].[3]

Douglas served its original answer in the southern district action on May 14, 1962 and, after being granted five extensions of time while he pursued his

---

1. Strauss removed the cable assembly from the plane after it landed, without permission, and sent it to his attorney.

2. Delta's own maintenance procedures required a check of the seat belts after every 220 flight hours, and such a test had been made on April 24, 1960, 3 weeks before the accident. However, no DC-8 in Delta's fleet had yet undergone a

major overhaul, in which the seat belts are removed from the seat structure and taken to the shop for inspection.

3. In November, 1964, Strauss sought to remove the EDPA suit against Delta (from which Douglas had by now been dismissed) to the Southern District of New York, but the application was denied.

EDPA litigation against Delta, Strauss filed a statement of readiness and note of issue in the SDNY action on May 13, 1965; a pretrial memorandum was served on Douglas in April, 1966. The EDPA suit, to which Strauss pinned his primary hopes of recovery, lumbered its way to trial in January, 1966 and resulted in a jury verdict and judgment in favor of Delta. Essentially, Delta's defense was that the cable assembly was a new innovation in the DC-8 and that the airline's routine safety precautions and inspections had failed to disclose any defects. Thus the EDPA trial did not foreclose, even by implication, Douglas' possible liability.

On May 12, 1966, four years after the complaint was filed in SDNY, Douglas sought leave to move to amend its answer to present—for the first time in the course of the litigation—its defense that California's one year Statute of Limitations on actions in implied warranty barred Strauss' cause of action in warranty or strict tort liability. The California law was applicable, it was argued, because that was the state in which the plane was sold and delivered to Delta—the state where Strauss' cause of action accrued. Judge Tyler granted leave to amend, over Strauss' vigorous opposition, on August 10, 1966. The SDNY trial commenced on April 8, 1968, at which time Judge Metzner felt obliged to follow Judge Tyler's order. After a two week trial devoted entirely to the issue of negligence, the jury returned a verdict for Douglas, and judgment was entered upon the verdict dismissing the action.

II. AMENDMENT OF THE PLEADINGS

A. *Leave to Amend to Be Freely Given, Absent Substantial Prejudice*

 Fed.R.Civ.P. 15(a) requires that leave to amend the pleadings be granted freely "when justice so requires." At the same time, it is clear that such leave should be denied where the amendment would cause substantial prejudice to a party to the action. See Middle Atlantic Utilities Co. v. SMW

Devel. Corp., 392 F.2d 380, 384 (2d Cir. 1968); United States v. 47 Bottles, More or Less, 320 F.2d 564, 573 (3d Cir. 1963), cert. denied, Schere v. United States, 375 U.S. 953, 84 S.Ct. 444, 11 L. Ed.2d 313; 1A Baron & Holtzoff, Federal Practice and Procedure (Wright ed. 1960) § 442; 3 Moore, Federal Practice ¶ 15.08 [2]. It seems to require little argument that where the party seeking to amend wishes to raise a defense of limitations long after the answer was first filed, a court would be remiss if it did not carefully balance the effects of such action for it is manifest that risk of substantial prejudice increases in proportion to the length of defendant's delay in seeking the amendment. That this maxim has substance is apparent from Strauss' argument that if the Statute of Limitations had been promptly raised, he could have undertaken various protective measures to avoid being frozen out completely, such as discontinuing this action and renewing it in another appropriate jurisdiction where it would not be time barred. See Ricciuti v. Voltarc Tubes, 277 F.2d 809 (2d Cir. 1960); Klee v. Pittsburgh & W. V. R. R., 22 F.R.D. 252 (W.D.Pa.1958). Moreover, we note that the Statute of Limitations is an affirmative or so-called "personal privilege" defense which may be waived if not promptly pleaded, Fed.R.Civ.P. 8(c); Wagner v. Fawcett Pub., 307 F.2d 409 (7th Cir. 1962), cert. denied 372 U.S. 909, 83 S.Ct. 723, 9 L.Ed.2d 718; Basko v. Winthrop Laboratories, 268 F.Supp. 26 (D.Conn.1967); Smith v. Ins. Co. of North America, 30 F.R.D. 540, 542 (M.D. Tenn.1962). See also Twentieth Century Fox v. Goldwyn, 328 F.2d 190, 214–215 (9th Cir. 1964), cert. denied 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87. In sum, the party wishing to raise the defense is obliged to plead the Statute of Limitations at the earliest possible moment. Certainty of success is not an essential element in determining whether to set forth the affirmative defense in a pleading. If the defense lurks in the case, vacillation can cause the other party irreparable injury.

## B. *Douglas Should Have Pleaded the Statute of Limitations Earlier*

■ We are of the view that Douglas should have raised the limitations defense in its original answer. Strauss' complaint, contrary to Douglas' argument, clearly apprised Douglas that his action would be based at least in part on the doctrine of implied warranty. Paragraph 6 of the complaint not only plainly refers to "breach of warranty" but utilizes the distinctive language of implied warranty claims—that the belts were "safe for the purposes for which they were intended to be used." Compare Uniform Commercial Code § 2–314(2) (c). Moreover, in response to an interrogatory posed by Douglas, Strauss, on October 28, 1963, explicitly informed Douglas that he was claiming that it had breached its implied warranty.

■ In moving to amend, Douglas attempted to excuse its long delay by arguing that it did not believe it could *prevail* on the limitations question until the decision in George v. Douglas Aircraft Co., 332 F.2d 73 (2d Cir. 1964), cert. denied 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 noted in 78 Harv.L.Rev. 881 (1965) was filed. *George*, Douglas claims, signaled a radical change in this court's interpretation of the choice of law

rules relating to Statutes of Limitations in implied warranty actions.[4] Until *George*, Douglas claims, the traditional rule of *lex loci delicti*[5] governed the choice of law in New York[6] and thus the only Statute that could be applied was that of the place of the accident, Florida, under which Strauss' action was not barred when the complaint was filed in the SDNY.

But, the doctrine enunciated in *George* did not spring full blown from the forehead of this court, as Judge Friendly acknowledged in his discussion, citing New York's "awareness" of the problem and the cases which have considered it. 332 F.2d at 78. As early as January 12, 1961, almost a year and a half before Douglas filed its answer in the present case, the Court of Appeals of New York clearly indicated, in the seminal case of Kilberg v. Northeast Airlines, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 135, 172 N.E.2d 526, 527 (1961)[7] that the old rule of *lex loci delicti* would no longer be applied mechanically to litigation arising out of airplane accidents, for an air traveler "may in a flight of a few hours' duration pass through several * * * commonwealths," making the place of injury "entirely fortuitous." The *Kilberg* court refused to impose the limit on recoveries under the Massachusetts wrongful death

4. *George* involved facts quite similar to those in the case before us. A Texan, a member of the crew of a Braniff DC–7C, sued Douglas, the manufacturer, for breach of implied warranty arising out of the crash of the plane in Florida. This court held that New York's "Borrowing Statute," now CPLR § 202 (McKinney, 1963), might make the Statute of Limitations of California applicable where, as in the instant action, the plane was sold and delivered in California. The borrowing statute applies the Statute of Limitations either of New York or of the jurisdiction where the cause of action accrued, whichever bars the action first. *George* opined that New York courts would consider the implied warranty action to accrue in California. It is interesting that Judge Friendly went on in *George* to consider the implications of applying Florida law, for the panel was not completely convinced that the New York courts would apply California law.

5. This doctrine requires the law of the jurisdiction in which the injury occurs to be applied to all aspects of the case. For a thorough examination of the rule and the doctrines that have supplanted it, see Cavers, The Choice of Law Process (1965).

6. Whose conflicts of law rules the District Court of the Southern District of New York is obliged to follow. Klaxon v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

7. *Kilberg* had been extensively discussed in numerous law review notes before Douglas filed its answer, e. g., 14 Ala. L.Rev. 423 (1962); 12 Buffalo L.Rev. 359 (1963); 61 Colum.L.Rev. 1497 (1961); 46 Corn.L.Q. 637 (1961); 30 Ford.L.Rev. 170 (1961); 15 Rutgers L.Rev. 620 (1961); 12 Syracuse L.Rev. 395 (1961); 28 U.Chi.L.Rev. 733 (1961); 39 U.Cinn.L.Rev. 511 (1961); 15 Vand. L.Rev. 271 (1961).

act required by Massachusetts law, although the plane in question crashed in Massachusetts. Thereafter, the New York Court of Appeals fully recognized the pivotal position of *Kilberg* in the evolution of the state's conflict of laws principles. See Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 748, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963).

Moreover, within six months after Douglas filed its answer in the SDNY, this court, sitting *en banc* in Pearson v. Northeast Airlines, 309 F.2d 553, 92 A.L.R.2d 1162 (2d Cir. 1962), cert. denied 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed. 2d 720, a case widely considered and reviewed,[8] expounded at length upon the implications of *Kilberg*. In *Pearson*, which arose from the same airplane tragedy that initiated the *Kilberg* litigation, we devoted considerable discussion to the possibility that a Statute of Limitations other than that of the place of injury might be applied. 309 F.2d at 558–59. It is an interesting coincidence that the same law firm now representing Douglas in this action, and which also drafted Douglas' May 14, 1962 answer to Strauss' complaint, also represented the unsuccessful litigant in *Pearson*. And while it is true that *Pearson* was not decided *en banc* until November 8, 1962, the choice of law question was argued in the spring of 1962, well before Douglas filed its answer in the case at bar. Thus, Douglas and its counsel by reason of these events and the clear indications that the law in this area was undergoing serious reappraisal, should have been well aware of the possibility (uncertain as it might have then seemed to them), that a Statute of Limitations defense might be effective against Strauss. (Indeed, Douglas had prevailed on just such a defense in Delaware.) In sum, *George* was not the sharp departure from previous law which Douglas claims, but merely the final brick in a structure which had been under construction for some time.

In any event, even if we were inclined to accept the contention that Douglas had no notice before *George* of the possible validity of a defense based on California's Statute, there was still an inexplicable, unreasonable, and prejudicial delay in waiting until 1966 to move to amend the answer. Douglas itself was the successful litigant in *George*.[9] That suit was instituted in March, 1963, less than a year after Douglas filed its answer in the present action. At the very least, then, Douglas should have amended its answer here when it raised these precise issues in *George*. In addition, we are unable to excuse Douglas' unexplained delay of another year and a half after the decision in *George* (decided April 24, 1964, cert. denied Nov. 9, 1964) before it even moved to amend its answer to Strauss' complaint.

### C. *Prejudice to Strauss*

Viewed in this perspective, the prejudice to Strauss resulting from Douglas' silence is easily understood. If Douglas had pleaded the California Statute of Limitations as a defense in May, 1962, Strauss would have had ample time to initiate his litigation in Florida, where the three year Statute of Limitations for actions "upon a contract, obligation or liability not founded upon an instrument of writing * * *." Fla.Stat.Anno. § 95.11(5) would not have run until May, 1963. Since Strauss had already responded to Douglas' victory in the Delaware action by bringing this suit in SDNY, it is logical to assume from his conduct that were this action time barred, Strauss would have instituted his action in a non-time barred jurisdiction. See Ricciuti v. Voltarc Tubes Inc., 277 F.2d 809 (2d Cir. 1960). And, even if Douglas

---

8. *Pearson* was noted in, e. g., 5 Ariz.L. Rev. 282 (1964); 32 Geo.Wash.L.Rev. 132 (1963); 76 Harv.L.Rev. 1484 (1963); 48 Iowa L.Rev. 1023 (1963); 29 J.Air.L. 69 (1963); 12 Kan.L.Rev. 113 (1963); 9 N.Y.L.F. 102 (1963); 37 St. John's L.Rev. 352 (1963); 17 Sw.L.J. 655 (1963); 14 Syr.L.Rev. 499 (1963); 36 Temp.L.Q. 350 (1963); 41 Tex.L.Rev. 836 (1963); 32 U.Cinn.L. Rev. 272 (1963); 35 U.Colo.L.Rev. 428 (1963); 24 U.Pitt.L.Rev. 635 (1963); 10 U.C.L.A.L.Rev. 670 (1963).

9. Albeit by different counsel, although Douglas' House Counsel could be expected to have been aware of both actions.

had moved to amend his answer as late as the date of this court's opinion in *George,* Strauss might still have been able to bring a Florida action grounded in tort, possibly alleging the doctrine of strict tort liability, before that state's four year general Statute of Limitations had run. Fla.Stat.Anno. § 95.11.

We do not intend by our ruling today to impose a requirement of perfect foresight on litigants or their counsel. Leave to amend freely given is still the intent of the rule. But, implicit in this liberal policy is the requirement that litigants will not do immeasurable harm to others by simply resting on the literal language of the rule in the belief that it must prevail in all cases, under all conditions even when they have been dilatory and substantial prejudice has resulted.

Accordingly, we hold that because of the substantial prejudice to Strauss caused by Douglas' excessive delay in raising the Statute of Limitations defense, the court below abused its discretion in permitting Douglas to amend its answer. We must, therefore, remand this action for retrial.

### III. EVIDENCE

Since our holding will result in this case going forward in the District Court we believe, under the circumstances, we are required to rule on the admissibility of certain evidence. At the trial Judge Metzner permitted Herbert Mailander, a design engineer employed by Douglas, to testify that improper and ineffective repairs were made by Delta to the cable assemblies of another DC–8 which Delta had also purchased from Douglas. Photographs of these repairs were received in evidence. The testimony was admitted, over objection, to show that Delta had abused the cable assemblies—a line of argument first raised by Strauss' own counsel. This evidence was presumably accorded considerable weight by the jury, because it asked to see the photographs of the repairs on the other plane shortly before it emerged from the jury room with a verdict for Douglas.

 Evidence of specific examples of other negligent repairs might conceivably be relevant to show a party's habit or custom to abuse, but such occurrences must be "numerous enough to base an inference of systematic conduct." 2 Wigmore, Evidence § 376 at 305 (3d ed. 1940). Here, there was evidence of but a single instance of repairs to another plane, with no showing of any correlation between the two planes. Thus, there was not a sufficient basis from which a jury could reasonably infer that the seat belts in Strauss' plane were also improperly repaired by Delta. And, any probative value of such evidence was greatly outweighed by its possibly prejudicial effect, as we can observe from the jury's curiosity and its quick verdict after seeing the faulted exhibit. See McCormick, Evidence § 167 at 350 (1964). We conclude therefore, that because of the substantially prejudicial effect of this evidence, Strauss will be permitted at the retrial to reassert his claim based on negligence in addition to his implied warranty claim.[10]

 We have examined the other claims of error raised by the parties and find the trial court's rulings were not improper.[11] We do not reach Strauss' contention that he has a claim based on the doctrine of strict tort liability.

10. Douglas argues that if we find the evidence of the repairs to be improper, we should also direct the exclusion of evidence of frayed cables in other Delta aircraft, which were admitted over Douglas' objection. But that evidence involved 191 instances of frayed cables on five of Delta's six DC–8s, including eight frayed cables on the plane involved in this accident. We believe this is a sufficiently large number of instances on which the jury might base an inference of systematic conduct.

11. Strauss argues that it was error for the trial judge to refuse to admit into evidence certain post-accident messages sent by Douglas. We disagree. Admitting such evidence, besides being questionable on grounds of relevancy, would penalize a defendant for making repairs. See 2 Wigmore, Evidence § 283 at 151, 156.