

Howard Adelman, Schwartz, Cooper, Kolb & Gaynor Chartered, Chicago, Ill., for Universal Research Laboratories, Inc.

James M. DeZelar, Robbins, Coe, Rubinstein & Shafran Ltd., Chicago, Ill., for Omnetics, Inc.

**In the Matter of UNIVERSAL RESEARCH LABORATORIES, INC., Bankrupt.**

**Bankruptcy No. 77 B 4082.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Sept. 2, 1981.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause came on to be heard upon the motion of Omnetics, Inc. for leave to file a counterclaim made more than three years after the pleadings had been closed in an adversary proceeding which had been initiated by the debtor's objection to a claim filed

by Omnetics. An understanding of the specific issues presently before the Court can be facilitated by a general description of the background of the Chapter XI filing on June 6, 1977.

Universal Research Laboratories, Inc. (hereinafter "Universal") is a corporation located near Chicago, Illinois, the principal business of which was the manufacture of electronic games to be played by displays on a television screen. Originally these video games were described generically as "pong games" because the format of the contest and the accompanying sounds were similar to those associated with actual games of table tennis (commonly called "Ping-Pong"). The core of all video games of this type is a small sophisticated electrical circuit, usually referred to as a "chip", which in its horizontal dimensions may be about the size of the small fingernail of an adult human hand. Such circuits will be referred to as "modules" in this opinion, as they were in communications between the parties.

Omnetics, Ltd. (hereinafter "Omnetics") is a corporation located in Syracuse, New York, the principal business of which is the manufacture of modules. The disputes between the two corporations arose with respect to modules which were, or were to be, manufactured by Omnetics and were sold, or contracted to be sold, to Universal. Hassan Kadah was president of Omnetics, and William E. Olliges was Chairman of the Board of Universal; most of the basic negotiations between the two corporations were conducted by these two individuals.

On June 6, 1977 Universal filed its Chapter XI petition. On July 27, 1977, Omnetics filed its proof of claim (docketed as claim 0–4) stating that it was owed "approximately $383,000.00" for "Goods and Services," and that the claim was founded on an open account which became due within 30 days from invoice date. On November 11, 1977, Universal filed an objection to the claim of Omnetics, requesting that the claim be reduced to $82,106.07; the objection was accompanied by a two count counterclaim. Count I of the counterclaim was for $1,448,098 and contended that Omnetics had breached a July 27, 1976 contract, thereby causing Universal an out-of-pocket loss of $387,958 and a loss of profits of $1,060,140. Count II alleged that Omnetics had breached a June 3, 1977 contract, thereby causing Universal a loss of profits of $280,750. By agreed order dated February 22, 1980 claim 0–4 was disallowed, and Count I of the counterclaim was disallowed and dismissed.

Omnetics' answer to Count II of Universal's counterclaim admitted the existence of the contract, denied any breach of it but asserted that Omnetics at all times was ready, and willing, and able to perform its obligations under the contract. There were two affirmative defenses asserted by Omnetics to the counterclaim of Universal.

The first affirmative defense was that Omnetics had been induced to enter the June 3, 1977 contract in reliance upon two fraudulent misrepresentations of Universal:

(a) that Universal would honor a $39,000 check payable to Omnetics and previously dishonored, and

(b) that Universal had a present intention to undertake to make immediate payment against its outstanding indebtedness of $384,000 to Omnetics. (This is the same alleged indebtedness as was the basis for claim 0–4 filed previously).

The second affirmative defense was that Universal breached the June 3, 1977 contract in the following ways:

(a) Universal unreasonably rejected modules for the stated reason that they were defective whereas they were not, in fact, defective;

(b) Universal repeatedly failed to pay for modules which it had accepted, in spite of demands for payment by Omnetics; and

(c) Universal refused to submit documents to its bank which the bank required before it would issue letters of credit.

In addition to the general denial and two affirmative defenses Omnetics also filed a

counterclaim in which it alleged that Universal had accepted 2,000 modules for which it refused to pay and prayed for judgment of $28,000 (the contract price was $14 per module). That answer was filed March 6, 1978. On March 6, 1978, Omnetics also filed a complaint respecting the dischargeability of the $39,000 represented by the dishonored check referred to above. That complaint was dismissed on April 6, 1978 on the ground that the time for filing dischargeability complaints had expired October 21, 1977, after it had been extended three times. Thereafter Omnetics filed a motion under Rule 906(b) of the Rules of Bankruptcy Procedure seeking to have enlarged on the grounds of excusable neglect the time for filing dischargeability complaints. After a trial lasting one full day, the Court concluded that the delay in filing had been caused either by ordinary neglect or by a strategic plan to raise the dischargeability issue as a counterclaim to an anticipated lawsuit by Universal. The motion to enlarge the time was denied August 14, 1978.

Since that date a plan of reorganization has been filed and confirmed. Distribution to creditors generally has been made and the case for a considerable period of time has been in the posture where closing would be imminent as soon as the adversary proceeding respecting the $280,750 counterclaim of Universal and the cross-counterclaim for $28,000 of Omnetics should be concluded. To this end the Court has been applying pressure on both parties, and Universal has been applying pressure on Omnetics to complete discovery so that trial of the case may commence.

Before addressing the broad issues raised by Omnetics' motion for leave to file an amended counterclaim, certain internal inconsistencies in the proposed amended counterclaim will be mentioned. The crux of the pleading is a contract entered June 3, 1977 for the delivery of 30,000 modules at $14 each. The 2,000 modules which Omnetics shipped are the subject of the original counterclaim for $28,000. Paragraph 5(c) of the proposed amended counterclaim states:

"(c) URL accepted 2,000 modules in October, 1977, and refused to pay OMNETICS the $28,000 due therefore."

Paragraph 6 provides as follows:

"6. The total amount received by Omnetics pursuant to said contract was $28,434."

The only contract mentioned in the counterclaim is the agreement of June 3, 1977, and consequently the only antecedent to which "said Contract" could refer is the June 3, 1977 contract. If Omnetics has received $28,434 under the contract, it has been overpaid $434 because the other allegations of the counterclaim are that Omnetics has delivered only 2,000 modules at a price of $14 each.

The final prayer for relief is that Omnetics be awarded $393,566. Simple arithmetic indicates that 30,000 times $14 equals $420,000 minus $28,434 equals $391,566.

More important than obvious errors in figures is what effect the allowance of the counterclaim would have upon the prompt trial of the issues in dispute between the parties. We have been advised by the parties that the pre-trial discovery on the existing pleadings finally has been completed but that they are in disagreement as to whether the addition of the proposed counterclaim will require additional discovery. A comparison of the theories of the existing counterclaim and the proposed counterclaim will reveal the probable answer to that question.

The original counterclaim of Omnetics is for $28,000 representing the contract price for 2,000 modules delivered at a price of $14 each. That issue would appear to be fairly simple because the price is not in dispute. Delivery should be proven easily, so that the basic issue would appear to be the quality of the modules which were delivered, whether they met the contract specifications and whether they were delivered on time. There may be some dispute as to whether payments made after June, 1977 were applicable to the June 3, 1977 contract or to some earlier previously unidentified contracts.

The nature of the proof on the proposed counterclaim for $393,455 is completely dif-

ferent; that is for loss of profits and not for goods sold and delivered. Two things are fundamental in a case of that nature:

(a) the plaintiff is entitled only to the gross sales price less all expenses of sale, and

(b) it is necessary for the plaintiff to mitigate damages by attempting to sell to another purchaser; by ceasing purchasing and production as soon as it becomes apparent that the contract will not be honored, and so forth.

Because these factors were not in issue previously there has been no discovery respecting the number of modules manufactured, other than the 2,000 delivered, nor what attempts were made to market them, nor what the costs of manufacture were, nor the sales expenses, nor the allocable management expenses. There has been no discovery respecting what attempts were made to mitigate damages by sales to third persons of completed modules, work in process, or raw materials and inventory. These aspects of discovery are much more extensive and much more complex than the discovery respecting the 2,000 modules sold which has taken nearly three years to complete.

There is another factor which must be considered and which was not mentioned in the briefs of the parties. Although the contract at issue was signed three days before the Chapter XI petition was filed, everything or virtually everything which was done with respect to performing the contract took place after the reorganization proceeding had commenced. A strong argument could be made that any liability which Universal might have with respect to a breach of contract would constitute an expense of administration. As stated previously, the plan of reorganization was confirmed in 1977 and distribution to the creditors commenced that year. If this counterclaim should be allowed and should be prosecuted successfully as an expense of administration, it probably would require that an effort be made to recover all distributed monies so that they could be paid out to Omnetics as an expense of administration. Equitable considerations would appear to preclude the ability of a creditor, such as Omnetics, to suppress his claim for three years and then to become senior to all other creditors who had pressed their claims promptly.

■ Turning now to the law to be applied to the facts set forth above, we find that Rule 11–61 of the Rules of Bankruptcy Procedure provides that Part VII of the Bankruptcy Rules governs adversary proceedings under Chapter XI. Bankruptcy Rule 713, entitled "Counterclaim and cross-claim" incorporates by reference Rule 13 of the Federal Rules of Civil Procedure with several exceptions which are not germane to the instant case. (The one which is will be discussed below). Bankruptcy Rule 715, entitled "Amended and Supplemental Pleadings" incorporates by reference Rule 15 of the Federal Rules of Civil Procedure, but it shortens the time limits in several respects. The Advisory Committee note explains that the purpose of the reduction in time was to expedite the bankruptcy proceedings, but without explaining the reason for expedition. In the usual civil case the interested parties are the plaintiff and the defendant, and whatever is equitable in that bi-polar setting is satisfactory, within certain overall constraints, to the courts as well as to the parties. In the usual bankruptcy setting, however, adversary proceedings other than dischargeability complaints, are of great concern to all parties in interest. If the estate or the trustee is the plaintiff, winning the adversary proceeding may increase the size of the estate and correspondingly increase the distribution to creditors. If the estate or the trustee is the defendant, losing the adversary proceeding may increase the amount of the debt entitled to recognition and thereby reduce the proportionate distribution to creditors. In order to have an estate administered expeditiously, therefore, it is essential that adversary proceedings which may affect the size of the net estate or the amount of the allowable debt be determined as promptly as possible. From time to time in the interest of dealing in niceties, all of us are prone to overlook that the purpose of bankruptcy law is to provide an equitable distribution of the debtor's assets among his creditors. *In re George E. Morris and Angelika Mer-*

cer *Morris, et al. v. Associates Finance Company, et al.,* 12 B.R. 321 (Bkrtcy.N.D. Ill.). With present interest costs to various classes of creditors ranging between 15% and 25%, it is more essential than ever before that the distribution be completed as early as possible because in most instances the claims will not themselves be earning interest.

In their briefs the parties go to considerable length in discussion of the application of Rule 13(f):

"(f) Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of Court set up the Counterclaim by amendment."

Neither party appears to be aware of the controlling first clause of Bankruptcy Rule 713:

"Rule 13 of the Federal Rules of Civil Procedure applies in adversary proceedings, except that (1) subdivision (f) does not apply . . ." (underscoring supplied).

Except for shortening the time periods from 20 days to 15 days and from 10 days to 5 days, Rule 715 of the Bankruptcy Rules does not differ substantially from Rule 15 of the Federal Rules, of which the controlling subsection provides:

"(a) *Amendments.* A party may amend his pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be longer, unless the Court otherwise orders."

Bearing in mind that Federal Rule 15(a) normally is applicable to situations where two parties are concerned, and Bankruptcy Rule 715 is applicable to a two party adversary proceeding which is an adjunct to a multi-party case, we may attempt to summarize the case law respecting Rule 15 before testing Rule 715 against those same standards. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) and *Zenith Radio Corp. v. Hazeltine Research Corp.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) suggest that generally a plaintiff should have an opportunity to have his entire case tried on the merits, in the absence of undue delay, bad faith or dilatory motives which would unduly prejudice the opposing party. See also, *United States v. Hougham,* 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960), *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152 (2d Cir. 1968), *Ricciuti v. Voltarc Tubes, Inc.,* 277 F.2d 809 (2d Cir. 1960). Delay, of itself, usually is not sufficient reason for a Court to deny leave to amend, but that proposition almost necessarily is limited to short delays because the probabilities are that a long delay will have caused a change of position on the part of the non-moving party, or made it more difficult and expensive to complete discovery or more difficult to obtain credible evidence. *Local 783, Allied Industrial Workers of America, AFL–CIO v. General Electric Co.,* 471 F.2d 751 (6th Cir. 1973), *Hines v. Delta Airlines, Inc.,* 461 F.2d 576 (5th Cir. 1972). *Armstrong Cork Co. v. Patterson-Sargent Co.,* 10 F.R.D. 534 (D.C. Oh.1951); *Smith v. Guaranty Service Corp.,* 51 F.R.D. 289 (D.C.Cal.1970); *Maschmejer v. Ingram,* 97 F.Supp. 639 (D.C.N.Y.1951). Where, as here, the moving party has known of the facts long before leave to amend was sought, the disposition of the Courts is not to grant leave. *Albee Homes, Inc. v. Lutman,* 406 F.2d 11 (3rd Cir. 1969); *Barrett v. Foster-Grant Co.,* 450 F.2d 1146 (1st Cir. 1971).

■ Although Omnetics argues that its motion is to amend its existing counterclaim for goods sold and delivered ($28,000), in fact Omnetics is presenting a new counterclaim for breach of contract ($393,566). Thus, under the guise of coming within Federal Rule 15(a) respecting amendments

to pleadings, what Omnetics is attempting to do is to cause to be allowed an omitted counterclaim, which is authorized under Federal Rule 13(f) under appropriate circumstances but is not provided for in Bankruptcy Rule 713.

The additional delays and expense which would be incurred by Universal if the proposed counterclaim were permitted to be filed would be a sufficient prejudice to Universal to cause the motion to be denied even if the issue were limited to a balancing of the equities between just those two parties. When there is taken into account the effect which additional delays will have upon closing the main case, it becomes manifest that the motion should be denied.

IT IS ORDERED THAT the motion for leave to file a counterclaim is denied. It is further ordered that a pre-trial conference be held October 9, 1981 at 8:00 a. m.